[Crim. No. 2975. Second Appellate District, Division One.—April 18, 1938.]

THE PEOPLE, Respondent, v. LOIS PRESTON GILBERT et al., Appellants.

Hill, Morgan & Bledsoe, Benjamin F. Bledsoe and Charles P. McCarthy for Appellants.

U. S. Webb, Attorney-General, R. S. McLaughlin, Deputy Attorney-General, Buron Fitts, District Attorney, and J. Miller Leavy, Deputy District Attorney, for Respondent.

WHITE, J.—On July 3, 1936, an indictment against the above-named appellants, as well as defendants Cleo Bond Baylis and Ernest M. Baylis, was returned by the grand jury of Los Angeles County. The indictment contained three separate charges of conspiracy in counts I, VI and VII, while count II charged grand theft, and counts III and IV alleged a violation of section 476a of the Penal Code. In count V the defendants were accused of a violation of section 115 of the Penal Code. On July 13, 1936, a demurrer to the indictment was interposed by all the defendants. On July 15, 1936, and before a ruling was had on the demurrer, an amended indictment was returned and filed by the grand jury, containing the same charges as in the original indictment, but amplifying the language and more completely and clearly

charging the same offenses as those alleged in the original indictment. A motion to set aside the amended indictment was made and a demurrer thereto was filed by all defendants. The motion to set aside the amended indictment was mainly predicated upon the ground that it was not an indictment amended by the district attorney after leave granted, but an attempt by the grand jury to return an amended indictment without order of court. The motion was denied and the demurrer overruled. After the entry of not guilty pleas, the cause proceeded to trial before the court sitting without a jury. During the trial, pursuant to the provisions of section 1099 of the Penal Code, the case was dismissed as to defendants Cleo Bond Baylis and Ernest M. Baylis, in order that they might be used as witnesses for the prosecution against the appellants herein.

At the conclusion of the People's case the defendants moved to dismiss each count of the amended indictment. This motion was granted as to counts III and IV and denied as to the remaining counts. At the conclusion of a six weeks' trial, these appellants were found not guilty on count II and guilty on counts I, V, VI and VII. Motions in arrest of judgment and for a new trial were denied, whereupon judgment was pronounced upon each of the four counts upon which a conviction was had. From these judgments and from the order denying them a new trial and their motion in arrest of judgment, appellants prosecute this appeal.

In count I of the amended indictment, the defendants were accused of the crime of criminal conspiracy, it being alleged that they conspired together and with other persons named in the pleading to commit the crimes of grand theft, a felony; violation of section 476a of the Penal Code, a felony; and violation of section 115 of the Penal Code, a felony. The indictment then goes on to set forth certain conduct and illegal activities and transactions upon the part of the defendants, as well as certain overt acts alleged to have taken place in furtherance of the conspiracy.

Count V charges the defendants with the offense of recording a false instrument; it being alleged that they did willfully, fraudulently and feloniously and knowingly procure and offer to be filed and recorded a certain deed of trust alleged to have been a false and forged instrument.

Count VI charges the defendants with the crime of criminal conspiracy, a felony, it being alleged that they and other persons named in the amended indictment conspired to commit the crime of violation of section 531 of the Penal Code, a misdemeanor. It is then alleged that as a part of the conspiracy and in pursuance thereof, the defendants did fraudulently convey certain properties, both real and personal, from one Effie F. W. Davis to the defendant Cleo Bond Baylis, Rae Findly, and other persons unknown to the grand jury, which properties, it is alleged, the said Effie F. W. Davis received by decree of distribution dated January 20, 1936, in the matter of the estate of Emma H. Wilson, deceased, probated in the Superior Court of Los Angeles County. This count further charges that the conspiracy therein alleged had for its object the deception and defrauding, defeating, hindering and delaying of creditors, and of depriving such creditors and others of their just debts, damages and demands. Seven overt acts are charged against the defendants under this count.

The final count upon which appellants herein were convicted, numbered VII in the amended indictment, charges the defendants therein named with the crime of criminal conspiracy, a felony, to wit, a conspiracy to violate section 182 of the Penal Code, subdivision 4, a felony. In this count it is alleged that the object of the conspiracy therein charged was to cheat and defraud the Title Insurance and Trust Company, a corporation, of property by means which were, in themselves, criminal, and the value of which money and property it is alleged was in excess of $200. This count alleges that in connection with an escrow pending with the said Title Insurance and Trust Company, the defendants falsely and fraudulently represented to said Title Insurance and Trust Company that good and valuable consideration was paid in connection with the transfer and conveyance of certain property. This count charges that the inquiries resulting in the alleged false and fraudulent representations were made by the Title Insurance and Trust Company of defendants in order that the former might determine and authorize the issuance of insurance upon the titles and conveyances involved in the escrow in question. Four overt acts in furtherance of the conspiracy are charged in this count.

▌ The first point made by appellants for a reversal of the judgment herein is based upon the refusal of the court to grant their said motion to set aside the amended indictment. The principal ground urged by appellants in support of said motion was that the amended indictment was not legally found by the grand jury, for the reason that it was not an indictment amended by the district attorney after leave granted, but an attempt by the grand jury to return an amended indictment after the defendants had pleaded by way of demurrer to the original indictment. Appellants' claim in this regard is without merit. It is the law that where, as in the instant case, no ruling had been made upon the demurrer, it is the unquestioned right of the grand jury to return a second indictment while the original indictment is in full force and after the defendants have entered their pleas thereto; and further, such second indictment may be found by the same grand jury which returned the original one, without their hearing any additional evidence. (*People* v. *Follette,* 74 Cal. App. 178, 185, 186, 189, 190 [240 Pac. 502], and cases therein cited.) It is only where the demurrer is sustained that the judgment becomes a bar unless the court directs a resubmission to the grand jury. Appellants have not suggested how under any possible conception of the record they were in any way prejudiced by the return of the second indictment. (*People* v. *Clawson,* 82 Cal. App. 422 [255 Pac. 552].) The case of *People* v. *Seitz,* 100 Cal. App. 113 [279 Pac. 1070], has no application to the case at bar because in the Seitz case the demurrer had been sustained without leave to amend.

▌ Appellants interposed a general and special demurrer to the second indictment which was overruled by the court. This action of the court is assigned as reversible error. With reference to count I, appellants rely upon section 954 of the Penal Code, asserting that this count charges a conspiracy to commit violation of three separate and distinct sections of the Penal Code. Appellants' claim in this regard is not tenable. The fact that the allegations of this particular count allege the object of the conspiracy to be the commission of three separate and distinct crimes does not change or alter the fact that the crime of conspiracy is the only offense charged in said count. In *People* v. *Welch,* 89 Cal.

App. 18 [264 Pac. 324], it was held that there is nothing indicated in sections 182 or 184 of the Penal Code to the effect that a charge of criminal conspiracy must be limited to an agreement to commit but one crime. As was said by the court in the Welch case, "It would seem to do violence to reason to hold that, where several persons agreed to rob a bank and as a part of the plan they determined to shoot any one who resisted or interfered, they may not be charged in one count with criminal conspiracy, because, forsooth, their evil designs contemplated murder as well as robbery." The trend of judicial decisions in this state is to the effect that to do all of the things enumerated in the different subdivisions of section 182 of the Penal Code amounts to a single offense only. (*People* v. *Johnson,* 22 Cal. App. 364 [134 Pac. 339].) The language of that section is inclusive and elastic enough to permit the framing of an indictment charging conspiracy to do or commit any or all of the illegal acts referred to therein. (*People* v. *MacPhee,* 26 Cal. App. 218, 220 [146 Pac. 522].)

 That portion of appellants' special demurrer directed to count I challenges the sufficiency of the allegations to enable a person of common understanding to know what is intended, in compliance with section 950 of the Penal Code, which requires that the indictment must contain a statement of the facts constituting the offense in ordinary and concise language. Appellants assert that it cannot be ascertained how the defendants "caused" Mrs. Davis to make the conveyances or issue the checks referred to in said count, and also take exception to the use of the word "caused" in connection with the overt acts numbered 1, 6, 7 and 8 in said count. There is nothing particularly difficult about construing the meaning of the word "caused", and reference to Webster's Dictionary reveals the definition of the word "cause" as follows: "To be the cause; or occasion of; to affect as an agent; to bring about; to bring into existence; to make." Synonyms are: "Create, produce, occasion, originate, induce." The purpose of an indictment or information is to inform the accused of the charge which he must meet at the trial. At common law, where this information came solely from the indictment, much particularity was required. Thus, in charging murder, it was necessary to charge the manner in which the murder was committed and the means used;

but under our system of administering criminal justice, as a part of the accusatory procedure the law now provides that in every case the accused is entitled to a copy of the testimony given before the grand jury or the committing magistrate, as the case may be. (Secs. 870, 925, Pen. Code.) And an accused is today better informed as to the case he must meet than was an accused under the detailed form of pleading required at common law. Section 952 of the Penal Code, which formerly required the pleading to set forth the particular circumstances of the offense charged, now as amended declares that it shall be sufficient if it charges "in any words sufficient to give the accused notice of the offense of which he is accused". The accused is simply entitled to notice of the offense of which he is charged, but not to the particular circumstances thereof, such detail being furnished him by the transcript of the testimony upon which the indictment or information was founded. (*People* v. *Beesly,* 119 Cal. App. 82 [6 Pac. (2d) 114, 970].) Section 952 must also be read in conjunction with section 951 of the Penal Code, in which latter section there is set out the form of an indictment where an example of our simplified form of pleading in criminal procedure is contained. While appellants base their demurrer entirely upon section 950 of the Penal Code, it is clear that section 950 must be construed in conjunction with sections 951, 952, and 959 in order to determine how and in what manner an indictment must allege and name the charge so that a defendant will be able to properly prepare a defense.

Demurring to count V, appellants contend that the allegations thereof fail to show wherein the instrument therein mentioned was false, and urge the same arguments as they set forth with reference to count I. Appellants had the benefit of the voluminous grand jury transcript to know how and in what manner the instrument was false. The allegations of count V specifically notified the defendants of the alleged falsity of the instrument in question, and the details and circumstances upon which the alleged falsity is predicated were furnished them by the transcript of the testimony upon which the indictment was founded. It might here be observed that the allegations in count V of the indictment conform practically *verbatim* to those used in the case of *People* v. *Standley,* 126 Cal. App. 739 [15 Pac. (2d) 180],

which is a leading case in connection with the interpretation of section 115 of the Penal Code. What we have just said applies as well to the complaint made and the arguments advanced in support of defendants' demurrer to counts VI and VII. The trial court was therefore correct in denying appellants' motion to set aside the amended indictment and in overruling their demurrer thereto.

Appellants contend that the evidence is not sufficient to sustain the decision of the trial court finding them guilty upon any of the four counts. A consideration of this claim on the part of appellants will necessitate a statement of some of the facts as shown by the testimony. The decision of the trial court being against the appellants, it will be only necessary for us in stating the facts to mention those which tend to support the decision. Appellants are husband and wife, practicing law together in the city of Los Angeles. In May, 1934, one James Cares, who was a beneficiary named in the will of one Emma Wilson, employed appellants as his attorneys to resist incompetency proceedings that had been instituted against said Emma Wilson. The latter had a sister, Effie Davis, with whom she lived. Upon the death of Emma Wilson, probate proceedings were commenced to administer her estate. The criminal prosecution with which we are here concerned grew out of the handling by appellants of this property while it was in process of administration as well as before and after it came into the hands of Effie Davis through a decree of distribution entered by the probate court. There was presented to the trial court evidence that in May, 1934, Emma Wilson owned property of the value of some fifty or sixty thousand dollars. During the next month following an examination of her by an alienist, legal proceedings were commenced, resulting in Miss Wilson's being declared incompetent by the superior court; and although appellant Mrs. Gilbert had been retained by Mr. Cares to look after his interests in connection with the incompetency proceedings, we find Mrs. Gilbert being appointed as Miss Wilson's guardian in September, 1934. Immediately thereafter both appellants moved into the home of their ward and shortly thereafter Mr. Cares, who had been living there for some fifteen years, and who had employed one of the appellants as his attorney, was forced to move away.

Shortly before Emma Wilson's death, appellant Mrs. Gilbert urged the former to sign a power of attorney giving Mrs. Gilbert the right to sell the property of Emma Wilson so that appellant could "do these things she wanted to do to save all those moneys to Effie Davis". Appellant Mrs. Gilbert acted as attorney for Mrs. Davis and continued to act as such up to the time the indictment in this case was returned. In handling the property of this estate, there was evidence that Mrs. Gilbert used not only her maiden name of Lois Preston, but also the name of Rae Findly, as well as her mother's present name of Emma M. Bowden. There was also testimony that appellant Mrs. Gilbert signed the name of Cleo Bond Baylis to certain instruments, and also signed certain other instruments in connection with the handling of the properties with the names of Rae Findly, L. Petitte, and Erdinc Pierce. Appellant Mrs. Gilbert also had property of this estate transferred into the names of Lonnie McCall, B. Padgett, and Emma Small. There is also evidence in the record that in connection with the sale of a ranch in Placer County, Mrs. Gilbert directed that Kalis Egg Corporation be made the beneficiary in the trust deed thereon. Two other trust deeds were executed on pieces of property in this estate purportedly signed by Cleo Bond Baylis in which G. D. Gilmore was the beneficiary. Mr. Kalis, who was the sole owner of Kalis Egg Corporation, testified that he knew nothing about this transaction, nor had he given anyone permission to make his company beneficiary in said trust deed, nor was he at all interested therein. In connection with the Gilmore trust deed, a Mr. George D. Gilmore testified that he was a friend of appellants; that as far as he knew he was the only G. D. Gilmore in the city of Los Angeles, and that he had never given anyone permission to use his name as the beneficiary in said trust deed, nor had he lent anyone any amount of money for which these or any other trust deeds had been received by him as security. An independent search of the city directory and telephone directory failed to disclose any other G. D. Gilmore in the city of Los Angeles.

There is also evidence that prior to the death of Emma Wilson, appellant Mrs. Gilbert, in the presence of appellant Mr. Gilbert, Effie Davis and James Cares, said, "Let's clip Rob Wilson's name off the will. The will is no good anyway. We can make a new will now by somebody holding Emma

Wilson's hand to put an X on the bottom of the will, and two witnesses to sign the names on that paper, on that will, and with the help of Dr. Orbison, Dr. Orbison's testimony goes good in court, and the will can be good now, of Emma Wilson''.

On or about October 5, 1934, Emma Wilson died, and just prior to that time appellant Mrs. Gilbert was removed by the court as guardian of Emma Wilson and a Mr. Brown was appointed in her place and stead. The evidence further indicates that from September, 1934, up until the trial of the cause in the superior court, Effie Davis and appellant Mrs. Gilbert were constantly together, living either in Mrs. Davis' home or in the home of appellants, or at a ranch near Arcadia, the purchase of which ranch appellant Mrs. Gilbert negotiated with the aid of her husband with money from this estate, and the title to which stood in the name of Erdine Pierce. On October 8, 1934, Robert Wilson, a cousin of Miss Wilson and Effie Davis, filed for probate in the Superior Court of Los Angeles County the purported will of Emma Wilson dated May 17, 1933. By the terms of this will, Effie Davis was given a life estate in the property and the remainder went to said Robert Wilson, with the exception that James Cares was given a house and lot and an interest in certain personalty. About a week later, appellants employed J. Clark Sellers, a handwriting expert, to examine this will, and advised him that in their opinion the same was a forgery. After a superficial examination of the document, the expert advised appellant Mrs. Gilbert informally that in his opinion the will was not a forgery, but he asked for additional time to examine the document more minutely before he was willing to express a definite opinion. Thereafter, on October 25, 1934, appellants as attorneys for Effie Davis filed for probate a will of Emma Wilson which appeared to be dated October 24, 1933. As to this last named date appearing on the will, the same handwriting expert testified at the trial of this case that in his opinion the last figure three had been altered and that the original date was probably 1932. By the terms of this will, Effie Davis acquired all of the estate of Emma Wilson with the exception of a house and lot and some personalty bequeathed to James Cares. Some time in November, 1934, both Cares and Wilson instituted separate proceedings to contest the probate of the last-named will of

Emma Wilson. Again, in December, 1934, appellant Mrs. Gilbert contacted J. Clark Sellers, the handwriting expert, and advised him that a later will had been found under the carpet, and that appellant was now sure that the will of May 17 was a genuine holographic will of Emma Wilson, but that the will found under the carpet bore a later date. Appellant Mrs. Gilbert expressed the opinion to the handwriting expert that the more recently discovered will had probably been stepped on and was therefore very dirty, and several holes were pierced in it, apparently being caused by the same having been stepped upon. She requested the handwriting expert to make an examination of a photostatic copy of the October, 1933, will and to examine the original in the office of the county clerk. On December 22, 1934, the handwriting expert rendered appellant Mrs. Gilbert a written opinion to the effect that the will of October 24, 1933, was entirely written in the hand of Emma Wilson, with the exception that in his opinion the final figure three in the date had been altered; that there was a hole in the vital portion of the figure two, that is, at the bottom thereof, and that in his opinion an oval had been added at the top of what remained of said figure two to make it appear a three; that in his opinion the will had been executed and dated October 24, 1932.

There was further testimony that in January, 1935, appellant Mr. Gilbert approached the attorney for Mr. Cares in the will contest and proposed a settlement with Mr. Cares upon condition that Mr. Cares would withdraw his contest and testify in their behalf in the contest brought by Robert Wilson. Mr. Cares' attorney told appellant Gilbert that this testimony would be contrary to his understanding of the facts, and that therefore he could not permit his client to so testify. Thereupon, appellant Mr. Gilbert said that if they could not settle with Mr. Cares, then they would settle with Robert Wilson and get him to help them in their defense of the action brought by Mr. Cares. Subsequently, Robert Wilson settled his contest with Mrs. Davis, accepting the latter's note in the amount of $10,000. In connection with this transaction several agreements were prepared by appellant Mrs. Gilbert, and it was agreed that appellants would defend Wilson in connection with any litigation which might grow out of the settlement transaction. It might here be noted

that both the August and October wills gave the property of Emma Wilson to her sister Effie Davis in fee, with only a small interest to either Cares or Wilson, whereas the May 17th will gave Effie Davis only a life estate.

The evidence indicates that the will contest of James Cares went to trial about June 21, 1935. While a jury was being selected, appellants discussed a settlement of this matter with Mr. Cares personally, outside the presence of the latter's counsel, and reached an agreement of settlement with Mr. Cares. Appellants thereupon advised Mr. Cares' attorney to this effect; the matter was taken up with the trial judge, and upon stipulation the will contest of Mr. Cares was dismissed and the will of October 24, 1933, which will be recalled as the will in connection with which the handwriting expert advised appellants there had been an alteration in the date, was then offered and admitted to probate. By this last-named settlement, James Cares secured a house and lot in the city of Los Angeles and a note signed by Effie Davis for $2,500. The probate court appointed Effie Davis executrix of the estate of her sister, Emma Wilson. This estate, which was appraised by the inheritance tax appraiser of the state of California for the purpose of inheritance taxes at some $60,000, consisted of various pieces of real estate, mortgages, trust deeds, and over eight hundred shares of Transamerica stock, cash in bank, and bonds.

The record then contains testimony to the effect that approximately four months before the estate of Emma Wilson was distributed to Effie Davis, to wit, on or about August 30, 1935, Mrs. Gilbert took Effie Davis to the transfer office of the Bank of America in San Francisco, and there had Mrs. Davis sign the necessary papers to transfer the stock out of the estate of Emma Wilson and into the name of Emma Small.

At this time the estate of Emma Wilson had a claim for $1,000 against the estate of Mary Slattery, which latter estate was also in process of probate. This claim was compromised for $350, and during the first part of October, 1935, the attorney for the Slattery estate delivered a check for $350 to the appellant Mrs. Gilbert. On October 12th, appellant Mrs. Gilbert and Mrs. Davis went to an automobile sales room and traded in an automobile for another car. At that time there was approximately $300 due the finance company, and the aforesaid check received from the estate of Slattery

was indorsed by Effie Davis as executrix and by appellant Mrs. Gilbert, who signed the name, ''Emma M. Bowden'', which was the name in which the new car was to be registered. The $50 difference between the amount due the finance company and the face of the check was received in cash by Mrs. Davis.

The record also discloses that in December, 1935, certain negotiations were had in Placer County in connection with the sale of a certain ranch located there which was a part of the estate of Emma Wilson. These negotiations culminated in the sale of the ranch for $1,000 cash and a first trust deed for approximately $4,650, naming the Kalis Egg Corporation as beneficiary (this is the corporation heretofore referred to, the owner of which denied any authorization to name his corporation as beneficiary, or that he or the corporation had any interest whatsoever in the transaction). An escrow was opened in connection with this transaction at the Placer County Title Company in Auburn, but the $1,000 check was taken outside of escrow. On the following morning appellant Mrs. Gilbert took the $1,000 check to the Placer County bank in Auburn and requested that a draft be issued by the bank in the amount of $1,000 payable to Lonnie McCall, whom she indicated as a young man there present with her, who appeared to be about thirteen or fourteen years of age. Pursuant to these instructions, the bank .issued a draft on the Anglo-California Bank of San Francisco in the name of Lonnie McCall and delivered the same to appellant Mrs. Gilbert, who gave as McCall's address her own home address. From the evidence, apparently the escrow in the Placer County Title Company was never completed. About a week later, appellant Mr. Gilbert appeared at the same automobile sales room above referred to, and after certain negotiations with regard to interest charges, paid off the contract on the car which he had purchased in the preceding October. This payment was made with the $1,000 draft above referred to payable to Lonnie McCall. This draft was indorsed ''Lonnie McCall, I. M. Gilbert, Emma Bowden, by I. M. Gilbert''. Of this money, $879.75 was used to pay off the balance due on the automobile, and $120.25 was returned to appellant Mr. Gilbert in the form of a check issued by the automobile dealer and payable to Emma Bowden. It might here be noted that certain evidence was received at the trial indicating that Effie

Davis was a person of inferior mentality and subject to the influence of stronger minds than her own. The admissibility of this evidence will be discussed later.

About January, 1935, when the estate of Emma Wilson was nearing the time for final distribution to Effie Davis, the defendants Mr. and Mrs. Baylis appeared upon the scene. Mr. Baylis was a real estate broker and contractor. The evidence indicates that he met Mrs. Effie Davis at appellants' office for the first time, and that an agreement was reached between the appellants, Effie Davis, and Mr. and Mrs. Baylis whereby all of the property to be received by Effie Davis from the estate of her sister would be transferred and assigned into the name of the defendant Cleo Bond Baylis, who was defendant Mr. Baylis' wife. Thereupon appellant Mrs. Gilbert prepared certain deeds and assignments transferring all of the estate of Emma Wilson from Effie Davis to Mrs. Baylis, with the exception of several hundred shares of Transamerica stock. At the same time, appellant Mrs. Gilbert prepared blank deeds and assignments which were signed by Mrs. Baylis but not acknowledged. Effie Davis, however, signed the deeds prepared for her signature, and the same were acknowledged before appellant Mr. Gilbert in his capacity as a notary public. An agreement was drawn under the terms of which Mr. Baylis would receive ten per cent commission for managing a certain twelve-court building that was to be erected upon certain estate property at Hermosa Beach. It appears that some question arose as to the validity of these transactions in the absence of some showing of the consideration which passed therefor. At that time Mr. Baylis was conducting his business with the Hollywood State Bank and carrying an account there in the name of Brea Investment Company, and although he had only approximately $150 in that account, appellant suggested that he draw several checks in the total amount of approximately $49,000 against his account, payable to Mrs. Davis, and that after she indorsed the same that he deposit them in his account at the bank, thereby accomplishing what in banking parlance is known as ''washing'' the checks through his account. The apparent purpose of this check transaction will be manifest in a subsequent discussion with reference to their presentation to the title company in support of the claim that a valuable consideration passed in connection with the execu-

tion of the deeds and other instruments last hereinabove referred to. This transaction involved five checks totaling approximately $49,000, which were made out payable to Effie Davis and signed by Mrs. Baylis, who was authorized to issue checks against the Brea Investment Company account. Thereafter these checks were indorsed by Mrs. Davis and immediately turned back to Mr. Baylis, who proceeded to deposit the same checks in his bank account and have them canceled as having been paid. We thus find defendant Baylis receiving back his $49,000 worth of checks and appellants and Mrs. Davis retaining all of the deeds which were executed in favor of Mrs. Baylis and those which were executed in blank by Mrs. Baylis. Thereafter the deeds from Mrs. Davis to Mrs. Baylis were recorded.

The transcript also contains evidence that about this time a Mr. McGinnis, who was assisting appellants in some of the legal matters in connection with the Emma Wilson estate, was told by appellant Mrs. Gilbert that in her opinion the thing for Mrs. Davis to do was to transfer her property into the names of third persons and to take a trip either to Europe or Hawaii in order to avoid payments called for in the settlements with James Cares and Robert Wilson. It was further testified that appellant Mrs. Gilbert suggested that some of this property might be transferred into the name of her mother, Mrs. Bowden. Mr. McGinnis, it appears, advised against such procedure, urging that such a transfer would be set aside. On January 20, 1936, the decree of distribution in the estate of Emma Wilson was entered, whereby all of the estate was distributed to Mrs. Davis with the exception of a house and lot which was distributed to Mr. Cares. In the evidence we again find appellant Mrs. Gilbert insisting to Mr. McGinnis that Mrs. Davis should put her property in the names of third persons in order to avoid payments on the settlements theretofore made with Cares and Wilson, and Mr. McGinnis again advising against such procedure.

Along about December, 1935, two trust deeds in which Mrs. Davis held the beneficial interest were paid off to the amount of $5,000. The bank which handled this transaction mailed the check to appellant Mrs. Gilbert, although it was made payable to Effie Davis. About ten days later, appellant Mrs. Gilbert had $1,000 of this check deposited in a bank account and had the bank issue to her a cashier's check for

the remaining $4,000 payable to Effie Davis. This cashier's check was later deposited in an escrow in connection with the purchase of certain property known as Lilac Terrace, and the instructions in this escrow showed that the title to this property was to be placed in the name of Rae Findly, who, by the way, was the housekeeper for appellants. In February, 1936, appellants and Mrs. Davis again appeared at the transfer office of the Bank of America in San Francisco and had Mrs. Davis sign the necessary papers to transfer 313 shares of Transamerica stock from the name of Emma Wilson, who was then deceased, into the name of B. Padgett, the latter of whom at some time previous had been a client of appellants in connection with a divorce action.

About this time, defendant Baylis arranged a loan at the Hollywood State Bank for $5,000, and put up as collateral therefor certain of the mortgages and trust deeds which had been assigned to his wife, Mrs. Baylis, by Effie Davis, and which securities came from the estate of Emma Wilson, deceased. The proceeds of this loan were deposited in the bank in an account under the name of "Cleo Bond Baylis Company, by L. Petitte". Defendant Mrs. Baylis' maiden name was Petitte. All checks on this account were drawn by Mrs. Gilbert, who signed such checks, "Cleo Bond Baylis Company by L. Petitte". From the moneys secured from the loan, the construction of the twelve-court building at Hermosa Beach and the improvements on certain property at Hawthorne were paid for. The funds from the sale of the Transamerica stock aforesaid were deposited in this account and used in connection with the building program as well as to purchase an equity in a five-acre ranch at Arcadia, title to which was taken in the name of Erdine Pierce.

About this time, appellant Mrs. Gilbert suggested that the property in which appellants Gilbert were living be transferred into the name of Mrs. Baylis; that Mrs. Gilbert's mother, Mrs. Bowden, had a mortgage on the property for nine or ten thousand dollars, and if Mrs. Baylis held title to the property, then the Baylises could possibly put a trust deed or mortgage on the property and borrow money to carry on the building program on the property that came from the Wilson estate. About this time, defendant Mr. Baylis told Mrs. Gilbert that if necessary to borrow money he would borrow the same from the Hollywood State Bank and put up

18

trust deeds as security therefor. It then appears that on February 26, 1936, the two trust deeds in which G. D. Gilmore was named beneficiary and the Title Guarantee and Trust Company trustee were recorded. One trust deed was for $6,000, secured by the Hermosa Beach property, and the other, for $3,000, was secured by certain property in Hawthorne that belonged to the Wilson estate. The record is apparently silent as to what became of this money. These trust deeds are the ones in connection with which G. D. Gilmore testified as heretofore set forth that he was without knowledge of or interest in the transactions. While these trust deeds were purportedly signed by Mrs. Cleo Bond Baylis before appellant I. M. Gilbert as a notary public, the defendants Mr. and Mrs. Baylis testified that they knew nothing about these trust deeds whatsoever, and Mrs. Baylis testified that whoever signed her name to the same did so without her knowledge or consent. While there was no direct testimony that appellants Mr. or Mrs. Gilbert signed the name of Mrs. Baylis to these last-named instruments, the appellant Mrs. Gilbert admitted that she had signed Mrs. Baylis' name to other instruments.

Subsequently, during the month of February, 1936, appellant Mrs. Gilbert opened another account in the Echo Park branch of the Bank of America under the name of "Lilac Terrace by Rae Findly". Contemporaneously therewith, arrangements were made to have the manager of the apartment property deposit the rentals in this account, and Mrs. Gilbert from time to time would transfer funds from this account to the Seventh and Olive Street branch of the Bank of America, to apply on the purchase of the Lilac Terrace Apartments.

About March 14, 1936, both appellants and a Mr. Price opened an escrow at the Beverly Hills National Bank and Trust Company. This escrow involved the exchange of certain property owned by Mr. Price for certain property which stood in the name of Cleo Bond Baylis under the transfers from Effie Davis heretofore referred to. The Beverly Hills National Bank and Trust Company placed orders with Title Insurance and Trust Company for preliminary reports as to the title to the property involved in the escrow, and thereafter the bank advised appellant Mr. Gilbert that the condition of the title to certain of the property was not satisfactory,

for which reason there might be some difficulty in completing the escrow. Appellant Mr. Gilbert, advised the escrow clerk that he would go direct to the title company and there produce necessary evidence to show that Mrs. Baylis had good title. Appellant Mrs. Gilbert and Mrs. Davis contacted the Title Insurance and Trust Company, one of whose vice-presidents stated that the company desired information concerning the consideration paid for the aforesaid conveyances from Mrs. Davis to Mrs. Baylis, and also as to whether or not Mrs. Davis had actually received said consideration. Appellant Mrs. Gilbert advised the trust company that a monetary consideration had been paid, and that these payments were evidenced by checks which could be produced. At the request of the trust company, appellant Mrs. Gilbert, Mrs. Davis, and defendants Mr. and Mrs. Baylis, on March 16th, appeared at the trust company, at which time there were produced canceled checks drawn on the Brea Investment Company account in the Hollywood State Bank totaling approximately $49,000, which checks, it was represented, evidenced the consideration paid for the transfers of property from Mrs. Davis to Mrs. Baylis. These checks will be remembered as the checks constituting the so-called "wash" transaction hereinbefore set forth. Upon this occasion defendant Mrs. Baylis, Mrs. Davis, and appellant Mrs. Gilbert signed affidavits setting forth the substance of the conversation and attesting to the fact that the transfer from Mrs. Davis to Mrs. Baylis was in fact a purchase and sale; that Mrs. Davis had no further interest in the property, and that the four checks presented constituted evidence of the consideration paid, and that Mrs. Baylis now owned the property. At no time was the Title Insurance and Trust Company advised of the true facts, nor was it apprised of the nature of the transactions under which Mrs. Baylis was holding title to the property in trust for Mrs. Davis. When appellant Mr. Gilbert appeared before the grand jury, and was asked concerning the purpose of issuing these checks on the Brea Investment Company account totaling approximately $49,000, he testified that it was in order to have evidence of the consideration for these conveyances, because if such evidence were not available the title company would not pass title to the property. During the month of May, 1936, the records of the Hollywood State Bank disclose that more than $3,000

worth of Transamerica stock which had originally belonged to the estate of Emma Wilson and had been transferred into other persons' names, was sold and the proceeds deposited in the account of the "Cleo Bond Baylis Company by L. Petitte".

During the month of June, 1936, when the grand jury had issued a subpoena for defendants Mr. and Mrs. Baylis to appear in connection with this case, appellant Mrs. Gilbert advised them that they might as well not get mixed up in this investigation, and if they went out of town they could not be served with a subpoena; and further suggested that if they were in town and were served with process, they would probably go down before the grand jury and be put in jail, but if they would leave town she would see that this matter was straightened out. Mr. and Mrs. Baylis did leave town, and after several weeks defendant Mr. Baylis returned and contacted Mrs. Gilbert, at which time she presented to him a document received in evidence at the trial as People's exhibit 50, which bore the signatures of Effie Davis, appellant Mrs. Gilbert, and defendant Mrs. Baylis. At the request of appellant Mrs. Gilbert, defendant Baylis also signed the agreement. The evidence indicates that appellant Mrs. Gilbert advised Mr. Baylis that she prepared that document in anticipation of being requested to present something before the grand jury in this matter, and that she had signed the name of defendant Mrs. Baylis thereto so that appellant would be able to use the document before the grand jury if she was called before Mrs. Baylis returned to town. Although this instrument bore the date January 11, 1936, it was admittedly executed several months later, and read in part as follows:

"That Parties of the Second Part" (Mrs. Davis and Mrs. Gilbert) "in accordance with the construction and finance of same, shall and do convey all title to certain properties, which is attached hereto and marked Exhibit 'A' and listed therein, and that as to the world, Cleo Bond Baylis is to be the owner, but as between the Parties, the Parties of the First Part," (Cleo Bond Baylis and E. M. Baylis) "shall only be trustees acting for each of the parties of the second part of an undivided one-half interest. . . .

"That the Parties of the First Part will at no time give out any information, concerning the said title, its properties,

or any work thereon, or any information of any nature whatsoever acquired by this agreement without first obtaining permission in writing by each of the Parties of the Second Part.''

The foregoing narrative of testimony received at the trial, showing as it does a course of conduct on the part of appellants teeming with fraud and replete with intrigue, deception and duplicity, presents evidence which, if believed, warranted the trial court in finding the appellants guilty on all four counts of the amended indictment upon which they were convicted. And where, as in the instant case, there is substantial evidence tending to support the verdict of the jury, or as in this case the decision of the trial judge sitting without a jury, this court cannot as a matter of law substitute its judgment on the facts for that of the trial judge. No rule of criminal law and procedure is better established in this state. In this case, where a jury was waived, it was the function of the trial court, both as a trier of the facts, and upon motion for new trial after the decision, to determine what facts are established by the evidence. Before this court, on appeal upon the ground of insufficiency of the evidence, can set aside the decision of the trial judge, which decision has been approved by him in the denial of a motion for a new trial, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence sufficient to support the conclusion of the trial court. (*People* v. *Tom Woo*, 181 Cal. 315, 326 [184 Pac. 389].) The Supreme Court and appellate courts of this state have uniformly held that where there is evidence tending to support a verdict or decision by a judge sitting without a jury, we cannot disturb the verdict or decision on the ground that it is not sustained by the evidence; and the application of this rule is strengthened in a case where, as here, the trial court has refused a new trial. It is settled beyond question that the weight to be accorded the evidence is a question for the trier of facts, whether judge or jury. (*People* v. *Ellis*, 188 Cal. 682 [206 Pac. 753].) The decision of the trial judge in this case was again approved by him on motion for new trial. The findings of the trial judge on this subject are conclusive upon this court. It may disturb such a finding only when we can say as a matter of law that there was no evidence to support it. (*People* v. *Erno*, 195 Cal. 272, 283 [232 Pac. 710]; *People* v.

*Tedesco,* 1 Cal. (2d) 211, 219 [34 Pac. (2d) 467] ; *People* v. *Marble,* 8 Cal. (2d) 139 [64 Pac. (2d) 135] ; *People* v. *Perkins,* 8 Cal. (2d) 502 [66 Pac. (2d) 631].)

At the trial evidence was offered by the prosecution to the effect that Effie Davis was incompetent. The testimony on this issue was in conflict. Contrary to the claim of appellants, the court was not required to find that Mrs. Davis was either insane or incompetent, but the court did have the right to give consideration to her mental capacity as testified to, in connection with all the other facts and circumstances in the case, as an aid to the court in determining the intent or intentions of the defendants, as well as their honesty or dishonesty in their dealings with Mrs. Davis while handling her money and property. This was relevant to the question of defendants' guilt or innocence; and as there was a conflict in the evidence on this point, we are bound by the findings of the trial judge thereon. The court did not err in its rulings on the admissibility of evidence relative to the mental status of Mrs. Davis.

It was not error to admit testimony as to the mental condition of Mrs. Davis as given by an attorney who had represented her. Such knowledge was not, as urged by appellants, confidential and privileged. It was held in *Oliver* v. *Warren,* 16 Cal. App. 164 [116 Pac. 312], that an attorney may testify as to the mental condition of his client, and that his knowledge upon this subject is not privileged. The testimony given in the instant case did not disclose that any communications between the attorney and his client were divulged, nor was his testimony based upon any communications had between the witness and his client, Effie Davis.

The dismissal of counts III and IV and the acquittal of appellants on count II did not operate as an acquittal of appellants under the conspiracy counts numbered I, VI, and VII, because the substantive offenses charged in counts II, III and IV did not constitute the only overt acts set forth in the conspiracy counts; and therefore the innocence of appellants of the substantive offenses did not constitute a determination that no criminal conspiracy existed. It is only when the substantive offense charged is alleged as a single entity to be the only overt act in furtherance of the conspiracy that an acquittal of the substantive offense operates as an acquittal of the conspiracy charge based solely

thereon. Where, as in the instant case, the portion of the counts charging conspiracy remaining unadjudicated is sufficient to constitute criminal conspiracy, a conviction on the latter charge will stand. (*In re Johnston*, 3 Cal (2d) 32, 35 [43 Pac. (2d) 541].) It is only where the not guilty verdict as to the substantive offense amounts to a finding that none of the overt· acts charged as part of the conspiracy were committed, that such a finding in effect acquits the defendant of the offense of conspiracy. Such was not the case here.

█ And further, although some of the overt acts charged in the conspiracy counts were not in themselves of a criminal nature, nevertheless, if such innocent acts were done and performed in preparation to carry out the conspiracy, they are sufficient overt acts within the meaning of the law of this state. (*People* v. *George*, 74 Cal. App. 440, 451, 458 [21 Pac. 97]; *People* v. *Stevens*, 78 Cal. App. 395, 405 [248 ·Pac. 696].) Appellants' contention is that the checks referred to as substantive offenses in counts III and IV are in effect used as overt acts 2 and 3 in count VI and overt acts 1 and 2 in count VII. However, these various overt acts merely charged that the defendants in this case caused to be issued certain checks payable to Effie Davis in various sums, drawn on the ''Brea Investment Company by Cleo Baylis'' account at the Hollywood State Bank, whereas the substantive offenses set out in counts III and IV allege that these checks were issued without sufficient funds; that these defendants knew that they had no funds or credits at said bank, and that the checks were delivered with intent then and there to cheat and defraud Effie Davis and the Hollywood State Bank. It is at once apparent that the overt acts above referred to in no way set forth or attempted to set forth a substantive offense of issuing checks without sufficient funds. These particular allegations in the conspiracy counts merely refer to one link in the chain of events occurring before the commission of the substantive offense. Under the holding in the Oliver and Stevens cases, *supra,* the defendants could have issued these checks without actually defrauding anyone, which would entitle them to an acquittal as to the substantive offense, but the mere issuance of the checks, although innocent, could have been considered by the trial court as a link in the chain of circumstances charged in the conspiracy counts. The conspiracies here charged, having been formu-

lated prior to the doing of the foregoing noncriminal acts, we hold they constituted overt acts within the rule laid down in the last-named cases, for they were links in a chain of circumstances showing the gradual unfolding of the plot to obtain the property of the estate of Emma Wilson and of Effie Davis for the unlawful purposes charged in the conspiracy counts of the amended indictment.

In a supplemental memorandum filed since this cause was upon our calendar, appellants direct our attention to the fact that at the trial evidence was introduced showing that the witness Robert J. Wilson obtained a judgment in the superior court for his $10,000 demand against Effie Davis; that such evidence was admitted in support of the charge contained in count VI that the appellants conspired to commit the crime of violation of section 531 of the Penal Code, which denounces a fraudulent conveyance of property to defeat, hinder or delay creditors in obtaining their just debts, damages or demands. Appellants lay special emphasis upon claim that in order for a debt or demand to be a *just* debt or demand within the meaning of section 531 of the Penal Code, it must be a debt or demand which is legally valid and collectible, as well as morally just. Appellants insist that the Wilson debt mentioned in count VI was void and without consideration, for the reason that the only consideration for it was a promise on the part of Wilson to testify truthfully as a witness in the will contest, and that such a promise does not constitute a valid consideration for a contract. Appellants cite us to a decision by Division Two of the District Court of Appeal, Second District (*Wilson* v. *Davis* (Cal. App. [76 Pac. (2d) 699]) reversing the judgment of the superior court which held that Wilson's demand and claim against Effie Davis was valid. We have read the appellate court decision in question, and find that the same does not pass upon the merits of the asserted claim in any respect and the reversal is based upon the grounds, as stated therein, "The evidence is in sharp conflict on the question of the true consideration for the agreement sued upon. Defendant was entitled to have the jury instructed as to the principle of law applicable in case the jury should find the

facts in accordance with her contention.'' Clearly the reversal of this case has no bearing upon or materiality in connection with the determination of the appeal now before us. The validity or justice of the claim was a mooted question upon which the evidence was in conflict, but in connection with which there was evidence of sufficient substantiality, if believed by the trial court, to warrant a conclusion that the debt was both just and legal, as an obligation assumed by Mrs. Davis for a valuable consideration received by her in connection with the settlement and compromise of the will contest, in which litigation both Mr. Wilson and Mrs. Davis claimed a beneficial interest.

During the trial, and before the defendants had gone into their defense, the court, on application of the district attorney, pursuant to the provisions of section 1099 of the Penal Code, made an order discharging the defendants Cleo Bond Baylis and Ernest M. Baylis in order that they might be called as witnesses for the People. It is the contention of appellants that pursuant to the provisions of section 1101 of the Penal Code, the dismissal order ''amounted to an acquittal'' and that thereafter Mr. and Mrs. Baylis could no longer be counted as coconspirators as a matter of law in deciding whether or not there had been any conspiracy; and further, that in determining whether the judgment of conviction of appellants on the conspiracy charges can stand as a matter of fact and also as a matter of law Mr. and Mrs. Baylis, by reason of their ''acquittal'' must be eliminated. Although there is a dearth of authority directly in point in California, we are of the opinion that the result claimed by appellants should not follow where the discharge is pursuant to section 1099 of the Penal Code. The purpose of the order of discharge, as indicated by the statute, is that the defendant who receives the benefit of the order of discharge ''may be a witness for the people''. The issue remains the same, notwithstanding the discharge, and we would be thwarting the legislative purpose should we engraft an exception upon the statute in favor of a coconspirator. In *Ex parte Stice,* 70 Cal. 51 [11 Pac. 459], cited by appellants, in considering the sections here involved, and referring to the status of a defendant so discharged, our Supreme Court says: ''He will under such circumstances be more at liberty in answering the

questions put to him, and will not be hampered by any apprehension of saying anything which may be used against him. He will, as regards the offense about which he is called to testify, feel no restraint whatever from fear of convicting himself. For this object, the sections under consideration were enacted. They are enabling in their character.''

In prosecutions for conspiracy, the conspiracy must be proved, but it is not essential to the conviction of coconspirators that another or all other coconspirators shall be tried and convicted. It is only where one is convicted and another or others are acquitted, resulting in a repugnancy upon the record, that the only convicted conspirator may be discharged. Where, as in the instant case, the discharge of an alleged coconspirator is not inconsistent with his guilt, but simply bars a subsequent prosecution of him, it does not invalidate the conviction of his coconspirators. Statutes such as sections 1099 and 1101 of the Penal Code, granting an immunity to persons testifying do not in our opinion acquit the witness of the offense, but the fact of his testifying bars a prosecution for such offense. While Mr. and Mrs. Baylis could not be further prosecuted, their discharge under the provisions of section 1099 did not amount to a declaration of their innocence of the charges against them in the conspiracy counts of the amended indictment. (*Bradshaw* v. *Territory of Washington*, 3 Wash. T. 265 [14 Pac. 594]; *Rutland* v. *Commonwealth*, 160 Ky. 77 [169 S. W. 584]; *Weber* v. *Commonwealth*, 24 Ky. Law. Rep. 1726 [72 S. W. 30]; *Williams* v. *State*, 169 Ind. 384 [82 N. E. 790]; *Berry* v. *State*, 202 Ind. 294 [165 N. E. 61, 173 N. E. 705, 72 A. L. R. 1177].)

Holding as we do that the discharge by the court as aforesaid of defendants Mr. and Mrs. Baylis does not eliminate them as coconspirators, makes it unnecessary to discuss appellants' next contention, that being husband and wife, they are in law but one person, with but one will, and therefore no prosecution for conspiracy can be maintained against them. It is elementary that where some third person joins in the conspiracy, the common-law rule just mentioned does not apply.

Appellants challenge the correctness of many rulings made by the trial court, the narration of which would unduly prolong this already lengthy opinion. However, we have pains-

takingly read the voluminous reporter's transcript in this case, containing as it does more that 3,000 pages; we have carefully considered the assignments of error in connection with the trial court's rulings, and have read appellants' briefs in connection therewith—from all of which we conclude that none of the rulings complained of militated against the substantial rights of appellants. The appellants had a fair and impartial trial—in fact, the learned trial judge displayed to the defense unusual consideration and patience. His decision was based upon clear and convincing proof. No other points raised require consideration.

The purported appeal from the order denying the motion in arrest of judgment is dismissed, for the reason that the statute does not authorize an appeal to be taken from such order by a defendant.

For the foregoing reasons, the judgments and order denying defendants' motion for a new trial are, and each of them is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 2, 1938, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 16, 1938.