[Crim. No. 1440. Fourth Dist. Feb. 15, 1960.]

THE PEOPLE, Respondent, v. JAMES WHITE DOCHERTY, Appellant.

A. Brigham Rose for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

GRIFFIN, P. J.—Defendant appeals from a judgment after conviction by a jury upon an information charging him with the crime of conspiracy "to cheat and defraud by criminal means and to obtain money and property by false pretenses and by false promises with intent not to perform such promises," in violation of section 182, subdivision 4 of the Penal Code. Defendant's alleged coconspirator, Piper Stewart, was not apprehended and the matter proceeded to trial as to the defendant Docherty alone.

The evidence disclosed that on January 21, 1959, defendant applied for a business license for roofing repair and gutter painting in the city of San Diego, giving 4386 Pacific Highway as his business and home address. Stewart was with him. The business license clerk then explained to him that, since the business address and the home address were the same, the application would have to be approved by the police department and gave him a form for this purpose. Defendant left and no further attempt was made to obtain this license. Shortly thereafter defendant called an answering service located at 2420 University Avenue and inquired concerning

rates. Later that afternoon he returned to the office of the business license clerk with Stewart. This time Stewart applied for the license, giving 2420 University Avenue as his business address and 4386 Pacific Highway as his residence. Since the residence address and the business address were different, the approval of the police department was not required and the license was issued.

A trailer park was located at 4386 Pacific Highway. Defendant admitted that he had never resided there but said he had noticed empty spaces in the park while driving past and that he had stopped and obtained the address intending to return later and secure space for his trailer. He testified that after obtaining the license he and Stewart returned to the trailer park intending to rent two empty spaces, but the manager would not rent them because the spaces were not the correct size for the trailers. The manager of the trailer park testified that he had never seen or talked with the defendant. On January 21 all the spaces in the park were rented and all but one were actually occupied by trailers.

During the morning of January 22, defendant and Stewart appeared at the office of the answering service at 2420 University Avenue. Stewart said that his nephew, Docherty, had called the day before and inquired about rates. Stewart and Docherty arranged for telephone answering service for the ''Piper Stewart Roofing Company.''

On the surface the evidence shows that between January 22, 1959, and February 2, 1959, defendant and Piper Stewart conducted what was ostensibly a legitimate roofing business in the cities of San Diego and National City. Actually, the evidence discloses that they were engaged in swindling homeowners by selling them worthless roofing jobs. The method of operation of defendant and Stewart can be illustrated by their conduct at the Doughty home, where defendant approached and talked with the owner's daughter-in-law, stating that her roof needed some repair and that he and his uncle had just finished a job for the Navy and the roofing material left over from the Navy job would evaporate if not used and that he could therefore do the job at a bargain price. He said that the material was an aluminum colored asphalt sealer and that it would take care of the roof, cover the roof completely and seal loose shingles so it would be weatherproof. Defendant said that, for the consideration of $45 (which was paid), he would repair loose shingles and that he would guarantee that the job would waterproof the roof for five years against leaks,

cracks, chipping and peeling and it would last for eight years. The Doughtys authorized defendant to do the job because it seemed to be such a good "deal." Defendant and Stewart then climbed to the roof of the house. Stewart brushed several loose sticks off with his hat and defendant threw several loose shingles to the ground. They then sprayed the roof with a mixture of asphalt, aluminum paste and gasoline. The entire job was completed in 20 minutes to one-half hour. After some initial reluctance, defendant signed a written guarantee.

In the first rain which occurred after the "roofing job," the aluminum rolled up in little balls and rolled off the roof and was all over the sidewalk around the house. The roof leaked after the work was done, although it had not leaked before. An expert roofer who examined the Doughty roof a few days later said that it appeared to have been coated with a thin coat of aluminum colored paint which would not waterproof or prolong the life of the roof.

The evidence reveals that, with minor variations, this was the pattern of conduct of defendant and Stewart in dealing with the other homeowners whom they victimized. Working door-to-door, they would approach the occupant of a dwelling and state that fortuitously they had some roofing material left from a prior job and offer to repair and recoat the prospective victim's roof at a bargain price. The homeowner would be told that the roof would be vulcanized, or sealed, to cover the roof completely, and that the job would last or be guaranteed for five or six years. As soon as the owner's acquiescence had been secured, defendant and Stewart would speedily apply a thin coating of an aluminum colored material to the roof and remove their ladders from the house. The homeowner would be requested to make immediate payment in cash for the job. Since a visual inspection from the ground would disclose a roof glittering brightly in the sun, the requested payment was usually immediately forthcoming. Defendant and his assistants would then depart, leaving no address or telephone number through which they could be contacted. In a few days the finish would curl up and roll off the roof, or fade and become streaked, or disappear entirely. An expert roofer who had had 20 years' experience with asphalt base type roofing materials examined several of defendant's roofing jobs and testified that they had not waterproofed or extended the life of the roofs so treated; that the customary process for applying an asphalt coating over an old roof requires that the asphalt be applied one-eighth of an inch

thick with a brush, after all nails, cracks and breaks are cemented up and the roof is thoroughly cleaned. This expert witness said that defendant's work indicated that he had not followed any of these procedures.

Defendant's testimony was that he was an honest businessman with limited education and slight experience in the roofing field and that he had come to San Diego from Ohio by way of Los Angeles intending to make San Diego his home. He worked in Los Angeles as a driveway repairman for a time and in November 1958 decided to coat roofs. He worked alone in Los Angeles, coating roofs using a substance known as "Alumatone." About January 6, 1959, he met Stewart in Los Angeles and about two weeks later went to San Diego where they met again. After applying for the license which was not granted on January 21, 1959, defendant decided to work with Stewart because he was short of money. Stewart mixed the concoction of asphalt, aluminum and gasoline which they used to cover roofs. Defendant produced several witnesses who testified they were satisfied with the job defendant did on their roofs. Defendant testified that he believed this substance would seal a roof for five years. Defendant's testimony was weakened by contradictory statements and by admissions that he made wilfully false and untrue statements to his customers. For example, on direct examination defendant testified he didn't know the name of the third man who worked with himself and Stewart, but on cross-examination he admitted his name was George Stewart. Defendant also admitted that he knew Alex McMillan, after first denying that he knew anyone by that name. He admitted that he had lied in telling Mrs. Doughty that he had just finished a job at the Navy Yard. He also told Mrs. Miller that Stewart Brothers Roofing Company was listed in the telephone book but this was untrue. Defendant gave customers a card listing his business address as 1350 North Highland Avenue in Hollywood and giving a Los Angeles telephone number, which telephone number was listed to the Acme Telephone Answering Service. Defendant's truck had the words "Halliday Roofing Company" stenciled on it. In response to an inquiry by a police officer after his arrest, defendant said that Halliday was his uncle, but at the trial he said that Halliday was his brother-in-law.

Defendant's first contention is that the information is insufficient because it does not set forth the purpose of the alleged conspiracy and because the overt acts charged are not, in themselves, criminal offenses. The information is couched

in the statutory language of Penal Code, section 182, subdivision 4. ▇ An accusatory pleading is sufficient if it is stated in the terms of the statute describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense with which he is charged. (Pen. Code, § 952; *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 61 [216 P.2d 859]; *People* v. *Gordon,* 71 Cal.App.2d 606 [163 P.2d 110].) ▇ It is not necessary in cases of conspiracy that the overt acts alleged be unlawful in themselves so long as the acts charged be done for the unlawful purpose of carrying out the conspiracy. (*People* v. *Gilbert,* 26 Cal.App.2d 1, 23 [78 P.2d 770] ; *People* v. *George,* 74 Cal.App. 440 [241 P. 97].)

▇ Defendant contends that error occurred when the prosecuting attorney called the president of the San Diego Better Business Bureau as a witness and asked him if he had studied the operations of the Williamson-McMillan Roofing Company. An objection was made before the question was answered and an offer of proof was made outside the presence of the jury. The trial court sustained the objection to the question. No curative or admonitory instruction was requested and none was given. Defendant urges that the Williamson-McMillan "clan" was the subject of wide and continuous unfavorable newspaper publicity and that the question was improperly designed to suggest to the jury that the defendant was affiliated with that group. There is no evidence in the record pertaining to the contents of these newspaper articles or showing that the jury was aware of them. ▇ Newspaper articles outside the record will not be considered by an appellate court. (*People* v. *Schmitt,* 155 Cal.App.2d 87 [317 P.2d 673], and cases cited.) ▇ The question appears to have been preliminary and contains nothing which would prejudice or degrade the defendant. ▇ The mere fact that a question has been asked and an objection thereto sustained does not constitute misconduct or prejudicial error. (*People* v. *Andrus,* 159 Cal.App.2d 673, 680 [324 P.2d 617].)

▇ Defendant asserts that the trial judge erred in giving certain preliminary instructions to the jury at the outset of the trial. However, the instructions complained of are not contained in the record on appeal and it must be presumed that instructions not contained in the appellate record are correct. Furthermore, the record indicates that the trial court repeated these instructions at the close of the case. Appellant must produce a record disclosing that the error relied on has

occurred and he was thereby prejudiced. (*People* v. *Mike,* 163 Cal.App.2d 466 [329 P.2d 519]; *People* v. *Denne,* 141 Cal.App.2d 499, 514 [297 P.2d 451].)

It is also contended that the trial court erred in instructing the jury about criminal conspiracies. In substance, the jury was instructed that a conspiracy involves the actions of more than one person; that Piper Stewart was named in the information as a codefendant and that his actions could be considered by the jury even though he was not in court and that it might be helpful if they pictured in their minds that Stewart was actually present at the counsel table. This was a correct statement of the applicable law. (*People* v. *Calhoun,* 50 Cal.2d 137 [323 P.2d 427]; *People* v. *Bompensiero,* 142 Cal.App.2d 693 [299 P.2d 725].)

Defendant also complains that he was prejudiced in the eyes of the jury by certain questions propounded to the defendant by the judge; that the judge's attitude was hostile and unfair and implied to the jury that defendant's testimony was unworthy of belief. The questions asked of defendant by the judge pertain to two separate points: First, inquiry was made as to the purpose of putting the aluminum substance in the mixture applied to the roofs. Second, the court inquired as to the defendant's knowledge of the present whereabouts of the vanished Piper Stewart. No objection was made to any of the questions propounded by the court.

The right of a trial judge to question witnesses is well established. (*People* v. *Corrigan,* 48 Cal.2d 551 [310 P.2d 953]; *People* v. *Candiotto,* 128 Cal.App.2d 347 [275 P.2d 500].) We cannot say, after examining the record, that the questions asked by the court indicate any hostility or bias prejudicial to the defendant. Furthermore, such questioning cannot be assigned as error where no objection to it was made. (*People* v. *Corrigan, supra,* pp. 555-556.)

Defendant also urges that his false statements to his customers constituted mere "puffing" and that the evidence is insufficient to sustain the verdict of the jury. It is now settled that a promise made without intention to perform is a misrepresentation of a state of mind and a false pretense and promise within the meaning of section 182, subdivision 4 of the Penal Code. (*People* v. *Moran,* 166 Cal.App.2d 410 [333 P.2d 243]; *People* v. *Ashley,* 42 Cal.2d 246, 262 [267 P.2d 271].) Direct evidence is not required to prove a conspiracy and its existence can be inferred from circumstantial evidence. (*People* v. *Moran, supra,* pp.

414-415; *People* v. *Bompensiero, supra,* pp. 705-706; *People* v. *Cornette,* 158 Cal.App.2d 724, 729 [322 P.2d 1001].) ▮ The distinction between ordinary commercial defaults and conduct which will be the subject of criminal prosecution for the offense here charged lies in the fraudulent intent of the coconspirators. (*People* v. *Ashley, supra,* p. 265; *People* v. *Weitz,* 42 Cal.2d 338 [267 P.2d 295]; *People* v. *Pond,* 44 Cal.2d 665, 672 [284 P.2d 793].) ▮ This intent and the other elements of the offense were sufficiently proved by the evidence. Defendant's testimony merely created a conflict in the evidence which was resolved by the verdict of the jury.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.