[Crim. No. 1559. Fourth Dist. May 29, 1961.]

THE PEOPLE, Respondent, v. WILLIS E. CARTER,
Appellant.

Willis E. Carter, in pro. per., for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

GRIFFIN, P. J.—In an amended information, appellant Willis E. Carter and defendant Charles Coldiron were charged with conspiracy, in that on April 4, 1959, they did falsely and maliciously conspire and agree, together and with Edward J. Greenwell and diverse other persons, to falsely and maliciously indict and cause to be indicted another person, to wit, Gerald Grant Graham, for a crime, and to procure him to be charged and arrested for a crime, in violation of Penal Code, section 182, subdivision 2. The overt acts charged are: (1) that on May 29, 1959, they caused a report to be filed with the police department that a pistol and other property had been stolen from a parked car, in Newport Beach; (2) that on May 31, 1959, they caused to be placed before the police chief information that a certain unnamed person was carrying on illegal activities and was keeping illegal articles in a vehicle bearing license number HUS-661; (3) that on June 12, 1959, they mailed a letter to the police of having witnessed a theft from a vehicle and giving the license number of the thief's car as HUS-661; (4) that on June 18, 1959, they gave a report to the police of contraband in a certain car and its location.

Count II charged appellant Carter and defendant Coldiron with conspiracy, in violation of Penal Code, section 182, subdivision 5, on April 4, 1959, in that they gave false evidence of violation of conditions of parole by said Graham to cause him to be returned to prison. The overt acts consisted of: (1) relating certain facts to a parole officer; (2) on May 29, causing a report to be made to the police that a pistol and other property had been stolen from a parked car; (3) on May 30, giving information to the police that a person was carrying on illegal activities, and that the said individual kept contraband in a car bearing license number HUS-661; (4) on

June 12, mailing a letter to the police reporting theft from car by the operator of a vehicle with license number HUS-661; and (5) on June 18, notifying the police of contraband in a certain car and its location.

Carter was also alleged to have suffered prior convictions for the felonies of grand larceny, first degree burglary, attempted grand theft, and assault with a deadly weapon, and with serving terms of imprisonment in the state prison therefor. Defendant Carter, represented by counsel, entered a plea of not guilty to Counts I and II. Carter admitted the prior felony convictions as charged. The information was dismissed as to defendant Coldiron. The jury returned a verdict of guilty on both Counts I and II as to Carter, hereinafter referred to as "defendant." A motion for a new trial was denied. He was sentenced to state prison on each count, sentences to run concurrently.

## EVIDENCE

In his brief, defendant Carter concedes (without admitting) that the evidence establishes that overt acts 2, 3 and 4 in Count I, and overt acts 3, 4 and 5 in Count II have been proven as against defendant, but claims that they were solely and directly committed by defendant and that there is no evidence that any other person, named or unnamed, had a part therein and accordingly argues that there could be no conspiracy to commit said acts. (Citing such authority as *People* v. *Talbott,* 65 Cal.App.2d 654 [151 P.2d 317] ; *People* v. *MacMullen,* 134 Cal.App. 81, 82 [24 P.2d 794] ; *People* v. *Comstock,* 147 Cal. App.2d 287, 294 [305 P.2d 228].)

Appellant then recites that as to overt act 1, Count I and overt act 2, Count II, the evidence clearly shows that two of the parties named, Coldiron and himself, were involved in this transaction, but claims they were not acting in concert or according to a common scheme or plan and with a corrupt intent. As to overt act 1, Count II, he claims the conflict of evidence in this respect is predicated on conclusions and therefore does not constitute a real conflict, particularly as to the allegation as to false evidence being used to cause Graham to be returned to prison. (Citing such authority as *People* v. *Flack,* 125 N.Y. 324 [26 N.E. 267, 269] ; *People* v. *Bowman,* 156 Cal.App.2d 784 [320 P.2d 70].)

The evidence shows that defendant Carter, who had been previously convicted of felonies and served time therefor in state prison, ran a tire-mold casting business in Lynwood.

He had several employees, including Charles Coldiron and Edward J. Greenwell, who were alleged to be coconspirators. Defendant's business partner was Mary Skolich; another employee was James Carr. Carter's wife knew a Mrs. Lester (also referred to as Mrs. Ebersole) who had a daughter named Fran Lester. Fran had a boy friend named Jerry Graham who was on parole from the state prison. He had several prior convictions on check charges and had three children by a former wife whom he was not supporting. Apparently Fran's mother was opposed to this relationship. Defendant and Mrs. Ebersole met and discussed this situation as to how it could be broken up, for fear of Fran's becoming a delinquent. As a result, Mrs. Ebersole and defendant visited Louis P. Carney, Graham's parole officer, and fully discussed the matter and related Graham's past and present conduct and record to him and indicated Graham was not suitable to be on parole. At that time, Carter falsely represented that he was Mrs. Ebersole's attorney and he left a letter with Carney directed to the chairman of the Adult Authority, setting forth many claimed reasons why his parole should be revoked. Carter claimed that Graham was not really married to Fran, and accordingly they were living an adulterous life. Apparently they had been married in Mexico before Graham's divorce had become final and they were remarried in June 1959. In the last week in May, Fran received a purported bulletin from the police, giving Graham's police record. It was not a true record. Fran showed it to her husband and they turned it over to the police.

About May 27, 1959, Graham reported to the Newport Beach Police Department indicating there was a rumor that the police were looking for him. A few days later the chief of police received, on his doorstep, an anonymous letter, stating in general that the writer's teenaged daughter had become involved in smoking marijuana cigarettes through inducement of a suspect known as Jerry (Graham's first name). It gave his automobile license number as HUS-661. A car bearing this number was driven by Graham. It also related that his address was 2411½ East Sixteenth Street, Newport Beach. The letter stated that this person kept a narcotics outfit in a bundle underneath the rear seat of his car and kept heroin in a pocket of his suit coat hanging by the rear window. It also claimed that he possessed a gun which he kept in the car. A telephone call, apparently emanating from Carter's place of business, was received by one McCarthy, a used car dealer,

purporting to be a call from the police department asking if Graham had purchased a certain car from him and informing him that it was being used for illegal purposes and reference was made to ''a man named Graham.'' Later, McCarthy received a letter containing a purported police record of Graham.

Several weeks later, the police received another letter, dated June 12, signed ''James Carr, P. O. Box 1445, Salinas,'' stating that about May 28 he and his wife were en route to San Diego and stopped at Howard's Restaurant; that his wife went in and he lay down in the rear seat of the car to rest; that a man driving a car with license number HUS-661 was looking in the glove compartments of several parked cars nearby and took articles from one of them. It appears that Charles Coldiron had previously reported to the police that a pistol belonging to him had been stolen while he was parked at Howard's Restaurant that night. The serial number of it was given to the police by Coldiron. On June 18, the police went to 2411½ East Sixteenth Street to contact Graham. Graham, after questioning, insisted on the police searching his car. Under the rear seat was found a Browning automatic pistol with the same serial number reported by Coldiron. A narcotics kit was found under the seat of that automobile. The car was taken to the police station for further search. At that time, defendant Greenwell was noticed observing the search from across the street and he had a conversation with one of the officers at that time. Later that day, the police received a telephone call stating:

''This morning there were two officers up at 2409 16th Street. They shook down the guy's car, but apparently didn't find anything. My interest in the case is that I am a neighbor. I live right across the court from that guy, and last week I was in the garage, I happened to notice that under the rear seat of his automobile he has a gun and a narcotics kit.''

The person calling refused to identify himself. The police officer, after hearing defendant Carter talking, stated that he believed it to be the same voice. Telephone records substantiated certain calls on given dates as originating from Carter's place of business. The officer went to Carter's place of business and discovered Coldiron working there. He and Carter were arrested and several articles, including a typewriter and paper, were seized and comparisons made of the typewritten letters, and they were identified as having been written on that type of machine. These letters and other documents, including a

similar letter sent to the parole officer, were introduced at the preliminary examination in the Newport Beach Municipal Court involving Greenwell, Carter and Coldiron. Carter refused to give an exemplar of his signature. The hearing was continued several times and during one of these continuances some of these documents were missing and could not be found in the court building. Evidence was introduced over strenuous objections that locks were broken on one of the main doors of the courtroom and an inner door and the next morning the exhibits were missing.

Coldiron, testifying for the People, said that defendant Carter had asked him on various occasions to go to the court building in Newport Beach, break in and take these exhibits, and that he would give him $500; that he observed Carter during a recess in the preliminary hearing manipulating the locks with a screwdriver; that Coldiron went down there but "chickened out" and went home; that when he later saw Carter, Carter told him it was no longer necessary for him to go to Newport Beach because he had taken care of it himself, and he related the details to him. When Greenwell was taken into custody he had a diagram or map of Graham's house at 2411½ East Sixteenth Street. In Carter's telephone book, taken from his office, was pencil-marked the name of the chief of police.

Graham denied ever having possession of, or knowing anything about, the gun and kit found in his car by the police. Apparently, Fran Graham was using Carter's place of business as a seat of operations for her place of business on occasions, but Graham had never met Carter until his arrest. There was evidence that Carter had purchased a car for Fran. Carter denied this.

Mrs. Skolich, testifying for the People, stated that she wrote a name on one of the envelopes here involved, and in the presence of Coldiron, James Carr and Carter, it was thrown on her desk by one of them and she signed the name "Charlie McCarthy" to it at the request of one of them.

Another witness identified the gun in evidence and stated that two years prior Coldiron brought it to him to temporarily keep for him and on May 23 Coldiron came to reclaim the gun and Carter came with him and he turned it over to Coldiron. On the witness stand, Coldiron testified that he went with Carter to pick up the gun and Carter paid him $25 for it; that thereafter he observed a bulletin, purportedly a police

bulletin, in reference to Graham, shown to him by Carter; that he went to the police department with Carter and reported that the gun had been stolen from him (Coldiron) and gave the serial number of it and said it had been stolen from his car while he was parked at Howard's Restaurant and that Carter told him to say this; that he, in fact, had never been to Howard's place; that Carter told him he had three alternatives: (1) to tell the truth, (2) to make a false report in reference to the stolen gun, or (3) Carter would buy him a car, give him some money and he would leave town; that he said he would go along with him in reference to the gun's being stolen when in fact it had not been; that Carter prepared a copy of a document spelling out what his story was to be and he subsequently took a copy to the public defender for his use. Coldiron then referred to the exhibits in the courtroom and Carter's desire to have them, saying that Carter offered him $500 to obtain them and that he agreed to do this; that on the first occasion he and Greenwell went there at Greenwell's suggestion; that Greenwell had the tools and a hacksaw blade and a jimmy which were applied to the doors, but a dog barked and scared them away; that he went back on three other occasions, tried to saw the lock but failed; that Carter later told him that he went there with the hacksaw, gained entrance and took the exhibits. Coldiron worked for Carter off and on for about seven years. A tape recording of Coldiron's statements to the police was received in evidence. In it he stated that he did not have any idea what this was all about, except that he suspected that Carter had been seeing Fran Graham and Jerry Graham had been living with her and he thought there was a possible jealousy there and that Carter pointed out a motel where he and Fran met. Carter, in his statement, admitting "romancing" with Fran. Coldiron stated that he had seen a C.I.I. report on Graham prior to the time he reported the gun stolen and he entertained this idea of jealousy at the time.

In three tape recordings of an interview with Carter after his arrest, Carter made certain statements in reference to who was the instigator of this general plan to place Graham back in prison and he said this arose from three different sources and "One of the sources is me. . . . A nickel's worth came from Fran Lester and some of it came from her mother." He stated he should never have gone to see Carney. He also indicated that he had thought of giving Fran a job in his office but he had some fear of putting her in the office with his partner

Mary Skolich. In one recording it was revealed that as the investigation progressed the question of a romance between Carter and Fran was discussed and Fran admitted it. James Carr denied writing the letter appearing above his name. He said he saw Fran in the office of Carter using typewriters on occasions. Evidence was produced that there was ill feeling and bitterness between Fran and her mother and Fran wanted to get away from her.

Greenwell disclaimed any actions in conjunction with Coldiron but he did admit that he rode with Coldiron to Newport Beach and that he wrote some of the letters in evidence, but he stated that he never knew Graham and never did anything designed to injure Graham or cause him to violate his parole. When arrested at Carter's place of business, Greenwell was later searched and a map or diagram was found on him showing the location of Graham's house. He admitted two prior felony convictions.

According to Coldiron, in order to obtain Graham's criminal record on file with the public defender, who defended Graham at his previous trial, Carter asked Coldiron to visit his office for the purpose of obtaining his files and to obtain the information. He testified he and Carter went there, climbed a ladder and pried open the public defender's desk and took his files to a nearby establishment, took notes from them and then returned the files and went back to Carter's plant.

Defendant Carter testified that Fran's mother called him in reference to Fran and the mother wanted help, either for herself or to hurt the daughter; that later he discussed with Fran her emotional problems; that the mother wanted him to go with her to see Graham's parole officer to relate her problems about Graham and Fran; that he obtained a copy of Graham's arrest report and divorce proceedings in Monterey County. As to the gun, he said he first discovered it in his desk drawer and Coldiron told him he had placed it there and it remained there a few days and that was the last time he saw it; that Coldiron later admitted he took it and said someone stole it from him; that he advised him to report that fact and then both of them went in Carter's car and reported it stolen to the police. He denied ever having any part in placing the gun or narcotics kit in Graham's car. He denied writing any of the letters in evidence containing information about Graham's record and claimed actions and indicating his parole should be revoked. He denied writing the letter to the parole officer about Graham's record but admitted it must have been

written on his typewriter and that the information contained therein was probably taken by someone from the record he had obtained from Monterey about Graham's past criminal record. Defendant then offered in evidence an affidavit signed by Coldiron, executed in the office of Carter's counsel, at the time all defendants were first charged with the conspiracy, stating in detail what part Coldiron played in reference to reporting the loss of his gun to the police department. This fact is admitted, but he denied any other connection with the alleged conspiracy and placed no blame on defendant Carter. It appears that just before signing this statement, prepared in legal form and legal language, Carter took Coldiron to Carter's lawyer. A bail bondsman was already present and Carter's company furnished $5,000 bail for Coldiron.

It appears that previously during an interview with the police, Coldiron did make a statement which involved Carter and a tape recording was made of it. Thereafter Coldiron again changed his story, and under immunity given him he testified for the prosecution as above indicated.

### Sufficiency of the Evidence

A mere recitation of the portion of the facts related clearly supports the finding of the jury that a conspiracy or an agreement did exist between defendant and Mrs. Ebersole to have Graham returned to prison by the use of false evidence. Even though the motive of Mrs. Ebersole and the motive of Carter may have been different, the result was to be the same. It would be difficult to hold, as a matter of law, that the claimed acts of the defendant and the alleged coconspirators were done innocently and without a purpose or an agreement as to the results. ■ A conspiracy may be established by circumstantial evidence and may be inferred from the acts and conduct of defendants in mutually carrying out a common purpose in violation of a statute. ■ The overt act contemplated in the definition of criminal conspiracy need not be criminal, but is sufficient if done in furtherance of the conspiracy. ■ Since members of a conspiracy are bound by all acts of all members, an overt act by one member is sufficient. ■ Once a conspiracy is established, all evidence of the substantive crimes becomes admissible against all participants, even though some conspirators were not present when the crimes were committed. ■ Before a judgment of conviction will be reversed for insufficiency of the evidence, it must be made clearly to appear that on no hypothesis what-

ever is there sufficient substantial evidence to support the trial court's conclusion. See *People* v. *Frankfort,* 114 Cal.App.2d 680, 688 [251 P.2d 401]; *People* v. *Gilbert,* 26 Cal.App.2d 1, 23 [78 P.2d 770]; *People* v. *Docherty,* 178 Cal.App.2d 33, 39 [2 Cal.Rptr. 722].

 Not only does the evidence show overt acts and a design to commit the unlawful acts, it shows as well, in uncontradicted fashion, defendant's use of others to effectuate his ends. Thus, we know that he and Coldiron filed the stolen gun report. Coldiron said so. So did Carter. From the act of the two men in filing the stolen gun report, the jury was entitled to infer that they both understood the purpose of that act. (*People* v. *Means,* 179 Cal.App.2d 72, 81 [3 Cal.Rptr. 591].) It can be inferred that Coldiron must have understood he was making a false report of the theft and that defendant intended to use this false report for a nefarious purpose. It would be logical and natural for him to suppose that it was the design of defendant to plant the gun on the victim, which was, in fact, done. He strongly suspected that Graham was the victim and that it was because of his jealousy that Carter wanted Graham to be returned to prison. He knew enough of what was going on and he helped defendant accomplish the unlawful design. These facts, when considered in connection with other circumstances, indicate and may constitute a corrupt, tacit agreement. It is logical to assume that Greenwell was the source of transmittal of the information to defendant in reference to the search of Graham's car and it implies the existence of a conspiracy, for there had to be a means of acquiring and transferring the information to Carter. (*People* v. *Garcia,* 187 Cal.App.2d 93, 102 [9 Cal.Rptr. 493].) This conclusion is particularly reasonable because identical maps of the Graham residence were found on both Carter and Greenwell. Involvement of Greenwell in the conspiracy is shown when he appeared at the police station at the time of the search of Graham's car and the subsequent telephone call to the police telling them, in effect, that they did not search Graham's car thoroughly enough. A proper instruction as to the necessity of proof of such agreement and the necessity of corroborating the testimony of an accomplice was given by the trial court. The circumstances presented by the evidence warranted the jury's verdict in this respect.

BURGLARY OF COURTROOM

 Defendant argues that the court erred in allowing

introduction of evidence, over objections, of the burglary of the courtroom during the preliminary hearing of defendant, since evidence of other offenses, not related to the conspiracy charge, is inadmissible.

The court properly allowed proof of these facts. The prosecution argued that it was admitted not for the purpose of showing a separate crime, but as evidence tending to show ''consciousness of guilt.'' The court instructed the jury that evidence of other crimes in the case was received for a limited purpose only, not to prove a distinct offense or continual criminality, but for such bearing, if any, as it might have on the question of whether defendant is innocent or guilty of the crime charged. See CALJIC, Form 33.

Defendant argues that only ''flight'' is admissible to show consciousness of guilt, under Penal Code, section 1127c, and that this section has no application to a separate offense.

No similar California case is cited where the conduct of a defendant was quite so brazen. An innocent man does not ordinarily steal the evidence that appears to incriminate him. It is true that the fact that this particular form of admissive conduct involves a penal offense introduces prejudicial elements. However, it is well settled that there are a number of execptions to the general rule excluding evidence of other crimes. ■ *People* v. *Weiss,* 50 Cal.2d 535, 554 [327 P.2d 527], holds that:

''Efforts to suppress testimony against himself indicate a consciousness of guilt on the part of a defendant, and evidence thereof is admissible against him.'' (Citing case.) See also *People* v. *Velarde,* 45 Cal.App. 520, 529 [188 P. 59] ; *People* v. *Downs,* 114 Cal.App.2d 758, 761 [251 P.2d 369] ; *People* v. *Kendall,* 111 Cal.App.2d 204, 213 [244 P.2d 418] ; *People* v. *Caruso,* 174 Cal.App.2d 624, 640 [345 P.2d 282] ; Witkin, California Evidence, 273-274, section 240. ■■ McCormick, Law of Evidence 330, lists as one of the admissible types of other crimes: ''Evidence of criminal acts of accused, constituting admissions by conduct, intended to obstruct justice or avoid punishment for the present crime.'' Citing *People* v. *Spaulding,* 309 Ill. 292 [141 N.E. 196], where, in a prosecution for murder of A it was held proper for the state to prove that the accused had later killed the only eyewitness of the murder and buried his body. ■ The evidence was properly admitted under the instruction given.

### Second Burglary

■ This same conclusion is reached in reference to the

evidence of the burglary of the public defender's office in reference to the record of Graham. The claim that this evidence, elicited on a cross-examination of the witness Coldiron, when produced by the defense after testifying for the People, was inadmissible is lacking in merit. While it is true that the inquiry relating to this burglary ran beyond the direct examination, an objection to this effect was not made. The court cannot be expected to exclude evidence on its own motion. A subsequent motion to strike it was a discretionary matter for the trial judge who is charged with the regulation of the order of procedure. (Penal Code, § 1094.) Had the objection been made and sustained, the effect would have only been to compel the prosecution to recall the witness as its own. (*People v. Newton,* 139 Cal.App.2d 289, 291 [293 P.2d 476].) The witness testified he had just recalled the incident and proof thereafter was given of such burglary. No prejudicial error resulted.

### CLAIM OF ILLEGAL SEARCH AND SEIZURE

Defendant complains because, at the time of defendant's second arrest on a charge of burglary, defendant's place of business was searched and a telephone book, atlas and a carbon copy of an affidavit of Coldiron were taken. The original copy of the affidavit was put in evidence by the defense on the conspiracy trial. The telephone book and atlas were also put in evidence in the conspiracy trial. Defendant claims that this last arrest was illegal because made by officers of another county and the proper procedure in connection with such an arrest was not followed. The objection to the admission of this evidence at the trial was not predicated on this ground nor brought to the attention of the trial court. We will therefore not consider the point on this appeal. Whether the exhibits taken were incidental to the establishment of the burglary charge is not clear. They may have had some bearing on the arrest and the search may have been considered incident to the arrest. It is the rule that once evidence is lawfully obtained, the state may use it in the enforcement of any law which may have been violated. (*People v. Lujan,* 141 Cal.App.2d 143 [296 P.2d 93]; *People v. Littlejohn,* 148 Cal.App.2d 786 [307 P.2d 425]; *People v. Cahill,* 163 Cal.App.2d 15 [328 P.2d 995].) Since the evidence was of such minor consequence and the two crimes charged were so intimately related, we do not consider its admission into evidence constituted prejudicial error justify-

ing a reversal of the judgment. (*People* v. *Tarantino,* 45 Cal. 2d 590, 598 [290 P.2d 505]; *People* v. *Stewart,* 144 Cal.App. 2d 555 [301 P.2d 301].)

■ No complaint is made in reference to seizure of other evidence obtained and used in the trial, with the possible exception of receiving in evidence, over an objection as immaterial, several blank sheets of watermarked paper which had been notarized by Mrs. Carter. There was evidence that some of the paper on which some of these typed letters were written had similar watermarks. They were properly received in evidence.

### READING EXHIBIT

■ Next, it is claimed that the trial court erroneously refused to allow defendant's counsel to read to the jury one of the exhibits offered at the time of its reception into evidence. The court told counsel he was entitled to read it during the presentation of his case to the jury. There is no showing that the jury did not read and consider all exhibits in evidence. No error appears in this respect.

### CLAIMED MISCONDUCT OF THE PROSECUTOR

■ Next, defendant lodges a claim of error because the prosecutor commented on the failure of the defendant to call as a witness the mother of Fran, with whom Carter visited Graham's parole officer. It is the rule that not only may the failure of the defendant to testify be commented upon (*People* v. *Adamson,* 27 Cal.2d 478 [165 P.2d 3]), but also that a logical witness may be the subject of comment when not called. (*People* v. *Gist,* 28 Cal.App.2d 287, 292 [82 P.2d 501]; *People* v. *Ruef,* 14 Cal.App. 576, 617 [114 P. 48, 54]; *People* v. *Keaton,* 211 Cal. 722, 725 [296 P. 609]; *People* v. *Fitzgerald,* 14 Cal.App.2d 180, 205 [58 P.2d 718]; *People* v. *Lyons,* 50 Cal.2d 245, 266 [34 P.2d 556]; *People* v. *Terry,* 180 Cal. App.2d 48, 54 [4 Cal.Rptr. 597].) Furthermore, there was no objection or assignment of error made at the time as to these remarks. (*People* v. *Gist, supra.*)

### INSTRUCTIONS

■ The court refused defendant's proffered instructions to the effect that the offense charged was conspiracy, and if the jury believed the defendants acted independently or in ignorance of defendant Carter's objectives and no conspiracy agreement existed between them or any other person, as to the common objective, it should acquit defendant. The trial court refused these related instructions as covered. It was fully

and adequately explained to the jury that the agreement was the essence of conspiracy. An instruction in the language of CALJIC 934, alternate, was given. No error resulted from the refusal to give the proffered instructions.

## SENTENCE

Lastly, defendant argues, with merit, as conceded by the attorney general, that the trial court exceeded its jurisdiction by imposing two sentences upon a verdict of guilty of violation of both sections 182, subdivision 2, and 182, subdivision 5, Penal Code, when only one single act of conspiracy has been established by the evidence (citing *People* v. *Kobey,* 105 Cal.App.2d 548 [234 P.2d 251] ; *People* v. *Yant,* 26 Cal. App.2d 725 [80 P.2d 506] ; *People* v. *Johnson,* 22 Cal.App. 362 [134 P. 339]), and that the imposition of dual sentences, even though made to run concurrently, may mislead the adult authority into believing a harsher treatment should be imposed.

The deputy district attorney and the trial judge, at the time of sentence, indicated that it was their belief that the charges made were all one conspiracy. Nevertheless, sentence was made to run concurrently on each count. In view of the concessions made, the evidence produced and the cases cited, we are convinced that the conspiracy, as here charged, was such that only a single punishment could be imposed. See *People* v. *Cossey,* 97 Cal.App.2d 101, 114 [217 P.2d 133] ; *People* v. *Nasworthy,* 94 Cal.App.2d 85, 90 [210 P.2d 83] ; Penal Code, section 654; *Neal* v. *State,* 55 Cal.2d 11 [9 Cal. Rptr. 607, 357 P.2d 839] ; *In re Dowding,* 188 Cal.App.2d 418, 421 [10 Cal.Rptr. 392].

Accordingly, under Penal Code, section 1260, Count II of the information is set aside and the judgment is modified to show the commission of only one offense, as alleged in Count I. As thus modified, the judgment and order denying new trial and order denying probation are affirmed and the adult authority should exclude from its consideration the purported sentence on Count II.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied June 22, 1961, and appellant's petition for a hearing by the Supreme Court was denied July 26, 1961.