[Crim. No. 2426. Fourth Dist., Div. One. May 19, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ADOLPHUS HOHENSEE et al., Defendants and Appellants.

John Alan Montag for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

BROWN (Gerald), P. J.—Adolphus Hohensee and Donald Kenneth Smith appeal from judgments of conviction entered upon jury verdicts of conspiracy to cheat and defraud, etc. (Pen. Code, § 182, subd. 4) and conspiracy to advertise a drug or device represented to have any effect in certain diseases, in violation of Health and Safety Code, section 26286.5 (Pen. Code, § 182, subd. 1).

Defendants' convictions stem from health lectures given by them in San Diego in 1962.

 Smith, one of Hohensee's traveling managers, arranged the San Diego lectures. He rented the Continental Room of the San Diego Hotel; placed advertisements in local newspapers; visited health food stores, placing posters in their windows and soliciting their mailing lists; hired local workers to assist his management of the lectures. At the lectures, Smith punched tickets, collected fees charged for special classes, and generally supervised collection of solicited contributions and sale of pamphlets. On occasion, he lectured.

Hohensee was the principal lecturer. The majority of the audience was over fifty years old. Hohensee instructed in part: Mercurochrome causes cancer; the white of an egg will heal a third degee burn without leaving a scar; protruding blood vessels on the back of the hand may indicate hardening of the arteries; Salk vaccine causes more polio than it cures, the Sabine vaccine is worse; a twenty-eight day diet of onion and water will eliminate arthritis, hardening of the arteries, heart condition and cancer; radioactive material in fig seeds will prevent and eliminate cancer; a diet of apple juice and olive oil will eliminate gall stones; ''Elixir of the Gods'' (honey) will eliminate arthritis, cleanse the heart of mucous and pus, and, if applied to the eye, will remove cataracts; through iris diagnosis he can tell which bones in the body were broken and what major operations were performed in the past, and mental and physical diseases likely to afflict within the next three to seven years. Expert testimony refuted each of these claims. Many more claims were made; but, being cumulative, they will not be recited here.

Lecturing, Hohensee elicited sympathy. He spoke, in his words, of the Rockefeller drug trust, and the American Medical Association, which he often called the American Murder Association. He charged these groups with prescribing unnecessary dope, drugs and surgery, solely for profit. They will go to any lengths, he instructed, to eliminate views

contrary to accepted profit motivated medical opinion. He told of a medical doctor killed for daring to challenge their views.

Hohensee described the efforts purportedly taken to eliminate him. He asserted the medical-drug trust spends $250,000 annually, through its stooge, the Federal Food and Drug Administration, attending his lectures and trying to catch him violating the law. He told of being unjustly arrested more times than he has fingers and toes. He described an earlier conviction, followed by brutal physical treatment in a federal prison. He expressed concern over the possibility of arrest in San Diego, expecting "prevarications" of arrest in the newspapers. He announced he smuggled lecture notes into San Diego from Mexico and knew if he lectured contrary to accepted medical opinion, in his words, "to the hoosegow I must go."

Because he recognized his views were contrary to accepted medical opinion, Hohensee repeatedly instructed he was not a physician, licensed in this State, nor willing to diagnose, prescribe or grant interviews, stating: "That disclaimer should hold the stooges that are in here." He proceeded to solicit written questions and to answer them stating: "I can do that without violating any laws. . . ."

Hohensee's announced purpose was to teach a health study class, and not to conduct a selling class. He purported to give away, among other things, lucite graters, "Elixir of the Gods," wrinkle removing cream and many health hints and diets. He explained, however, he operates without an endowment. He interrupted the lectures to pass out envelopes for contributions, stating at one lecture:

". . . be very liberal, and do all you can. Now if any of you need change for a hundred dollar bill, raise your hand. If it's a fifty or a twenty or a ten, don't bother Don for change, just put it right in." At one lecture, deeming the collected contributions inadequate, he ordered a second collection. At another lecture he recited:

"Oh, I'll keep giving things away free around here, 'cause I know I can depend on that collection. Oh, that collection was terrific last night. . . ."

Defendants charged $25 for their special classes, rather than the $50 represented as their regular fee. At the classes they sold blenders for $49.95 and tenderizers for $250. The blenders cost them $18.59.

Defendants make thirteen unmeritorious contentions:

1) *The indictment failed to give defendants notice of the offenses charged.*

■ The indictment is couched in the language of Penal Code, sections 182, subdivision 1 and 182 subdivision 4, and Health and Safety Code, section 26286.5, and lists ten overt acts. Pleading in terms of these statutes sufficiently notified of the offenses charged (*People* v. *Singer,* 217 Cal.App.2d 743 [32 Cal.Rptr. 701]; *People* v. *Docherty,* 178 Cal.App.2d 33 [2 Cal.Rptr. 722]; *People* v. *Mills,* 162 Cal.App.2d 840 [328 P.2d 1049]; see *People* v. *Lamb,* 204 Cal.App.2d 255 [22 Cal.Rptr. 284]; *People* v. *Mason,* 184 Cal.App.2d 317 [7 Cal.Rptr. 627]). ■ The overt acts charged, contrary to defendants' assertion, need not be criminal acts (*People* v. *Docherty, supra,* 178 Cal.App.2d 33; *People* v. *George,* 74 Cal.App. 440 [241 P. 97]; see *People* v. *Saugstad,* 203 Cal.App.2d 536 [21 Cal.Rptr. 740]; *People* v. *Garcia,* 187 Cal.App.2d 93 [9 Cal. Rptr. 493]; *People* v. *Robinson,* 43 Cal.2d 132 [271 P.2d 865]). ■ Defendants, furthermore, were given a copy of the grand jury transcript, which notified them of the charges (*Callan* v. *Superior Court,* 204 Cal.App.2d 652 [22 Cal.Rptr. 508]; *People* v. *Anderson,* 55 Cal.2d 655 [12 Cal.Rptr. 500, 361 P.2d 32]; *People* v. *Roberts,* 40 Cal.2d 483 [254 P.2d 501]; *People* v. *Gilbert,* 26 Cal.App.2d 1 [78 P.2d 770]).

2) *Tape recording the lectures constituted an unreasonable search and seizure.*

■ Food and Drug Inspector Charles M. Duggie entered a loft above the Continental Room with the hotel's consent, placed a microphone three feet from a loudspeaker set in the Continental Room's ceiling and recorded defendants' lectures. As in *People* v. *Jefferson,* 230 Cal.App.2d 151 [40 Cal. Rptr. 715], and *People* v. *Norton,* 209 Cal.App..2d 173 [25 Cal.Rptr. 676], this case is unlike *Bielicki* v. *Superior Court,* 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288], and *Britt* v. *Superior Court,* 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817], upon which defendants rely. Duggie did not spy on defendants through holes bored or other openings made for spying into a private place. The lectures were public. His hearing what the audience heard was not a search (*People* v. *Holloway,* 230 Cal.App.2d 834 [41 Cal.Rptr. 325]; *People* v. *Norton, supra,* 209 Cal.App.2d 173; *People* v. *Roberts,* 182 Cal.App.2d 431 [6 Cal.Rptr. 161]).

Unlike *Silverman* v. *United States,* 365 U.S. 505 [5 L.Ed.2d

734, 81 S.Ct. 679], upon which defendants rely, placing the microphone in the loft three feet from the loudspeaker was not an unauthorized physical intrusion into a private area. (See *People* v. *Hughes,* 241 Cal.App.2d 622 [50 Cal.Rptr. 716]; *People* v. *Rucker,* 197 Cal.App.2d 18 [17 Cal.Rptr. 98]; *People* v. *Graff,* 144 Cal.App.2d 199 [300 P.2d 837].) At trial, furthermore, at one point Hohensee announced: ''As far as I am concerned, I want everything played so the jury and his Honor can hear all the truth.''

3) *The trial court erroneously admitted the portion of the taped lectures in which Hohensee referred to his prison record.*

 Hohensee bragged, as recorded, he had been ''hailed'' into court more times than he had fingers and toes, and, among other things, had been railroaded into federal prison; these arrests resulted from his daring willingness to lecture contrary to accepted medical opinion. ██ ██ The rule respecting evidence of other acts or conduct is well-stated by our Supreme Court in *People* v. *Lopez,* 60 Cal.2d 223, 249-250 [32 Cal.Rptr. 424, 384 P.2d 16]:

'' 'It is settled in this state . . . that except when it shows merely criminal disposition (*People* v. *Cook* (1905) 148 Cal. 334, 340 [83 P. 43]; *People* v. *Glass* (1910) 158 Cal. 650, 658 [112 P. 281]), evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. ''The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, . . . whether it be part of a single design or not.'' ' (*People* v. *Peete* (1946) 28 Cal.2d 306, 314-315 [1] [169 P.2d 924].)''

 Hohensee's statements tend logically, naturally, and by reasonable inference to establish a general scheme, including the instant offenses, of defrauding by eliciting sympathy, by self description as a martyr willing to suffer the consequences of challenging the so-called medical-drug trust in order to spread health truths, by apparently giving away advice, literature and potions out of righteous compulsion, and, then, soliciting and collecting considerable contributions from his elderly victims. There was no error in admitting his statements. (See *People* v. *Adamson,* 225 Cal.App.2d 74 [36

Cal.Rptr. 894]; *People* v. *Kelley*, 66 Cal.2d 232 [57 Cal. Rptr. 363, 424 P.2d 947].)

4) *The evidence of conspiracy is insufficient.*

 The essence of a criminal conspiracy is the evil or corrupt agreement to do an unlawful act (*People* v. *Marsh*, 58 Cal.2d 732 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Bernhardt*, 222 Cal.App.2d 567 [35 Cal.Rptr. 401]; *People* v. *Garcia, supra*, 187 Cal.App.2d 93; *People* v. *Bowman*, 156 Cal.App.2d 784, 797 [320 P.2d 70]). Defendants contend there is insufficient evidence of a corrupt agreement. The evidence recited above sufficiently supports the finding of an agreement between Hohensee and his business manager, Smith. Whether the agreement was corrupt brings us to defendants' next contention.

5) *The evidence of intent is insufficient.*

Defendants contend there is no evidence of intent to defraud. They, however, induced belief in false health claims, elicited sympathy and confidence, purportedly gave away their wares, and, then, pressured contributions. In Hohensee's words, ''Oh, I'll keep giving things away free around here, 'cause I know I can depend on that collection.'' At one lecture Hohensee announced the discovery of ''Elixir of the Gods'' at his El Rancho Adolphus in Pennsylvania. At great personal cost, he promised to fly Elixir to San Diego and give it away. Elixir, he revealed is not available in California. He gave bottles of Elixir away. The bottles contained honey made in San Diego County and purchased there by him. This evidence and the entire scheme supports the finding of intent to defraud.

 Defendants contend there is no evidence of intent to advertise a drug or device represented to have any effect in certain diseases, including cancer, cataracts, gallstones, heart and vascular diseases, as prohibited by Health and Safety Code, section 26286.5. The evidence supports a finding to the contrary. Advertisements means all representations ''. . . for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase or sale of drugs or devices'' (Health & Saf. Code, § 26209). In effect, defendants sold honey, lucite graters, wrinkle removing cream, tenderizers and blenders, representing them, to induce sale; to be essential to proper health care. As represented, the graters, tenderizers and blenders are devices within Health and Safety Code, section 26202, which provides:

" 'Device' means instruments, apparatus and contrivances, including their components, parts, products or by-products of a device, and accessories, used or intended (1) for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; or (2) to affect the structure or any function of the body of man or other animals."

Similarly, as represented, the honey and cream are drugs, i.e., articles intended for use in the diagnosis, cure, treatment or prevention of disease in man or other animals, as defined in Health and Safety Code, section 26200. In other words, defendants violated Health and Safety Code, section 26286.5. The inference of intent to advertise readily arises.

 Defendants contend there is no evidence they knew it was unlawful to advertise. In *People* v. *Smith*, 63 Cal.2d 779, 793 [48 Cal.Rptr. 382, 409 P.2d 222], quoting *People* v. *Marsh*, *supra*, 58 Cal.2d 732, 743, quoting *People* v. *Bucchierre*, 57 Cal.App.2d 153, 163 [134 P.2d 505], our Supreme Court said:

" 'The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?' "

The evidence discloses Hohensee's self-described arrests, his belief the Federal Food and Drug Administration spends $250,000 annually attempting to catch him violating the law, his careful disclaimer of recognized professional status, his statement he can answer questions from the podium without violating law, his belief the so-called medical drug trust through the federal government has the power to impose criminal punishment on anyone challenging accepted medical opinion, and his concern over the possibility of arrest in San Diego. From this evidence the jury was entitled to infer defendants did not honestly believe they could lawfully advertise and falsely represent their creams, Elixir, graters, blenders, and tenderizers, in furtherance of their scheme to cheat and defraud.

Defendants do not contend they honestly believed it lawful to defraud, nor would such a contention be meritorious.

6) *The evidence of cheating and defrauding is insufficient.*

 Defendants point out no victim testified to being defrauded. None need testify. Defendants were convicted of *conspiracy* to cheat and defraud, not cheating and defraud-

ing. The evil agreement itself is unlawful. Whether or not the agreement is carried out is immaterial to the charge of conspiracy.

7) *There was no advertisement of a drug or device within the meaning of Health and Safety Code, section 26286.5.*

▪ There need be no advertisement to sustain a conviction for conspiracy to advertise. We determined, furthermore, in discussing defendants' intent, the evidence, if required, would support a finding of advertisement within Health and Safety Code, section 26286.5.

8) *Health and Safety Code, section 26286.5 is unconstitutional.*

▪ Defendants contend Health and Safety Code, section 26286.5, as applied, violates due process because vague and standardless, leaving uncertain what is prohibited, and unduly restricts freedom of expression, citing *Giaccio* v. *Pennsylvania,* 382 U.S.. 399 [15 L.Ed.2d 447, 86 S.Ct. 518] ; and *In re Schillaci,* 196 Cal.App.2d 591 [16 Cal.Rptr. 757]. In substance defendants argue the statute prohibits expressing any view about the listed diseases; no demarcation line exists between the expression of philosophies of life touching on diseases and representation about drugs and devices by persons directly selling them in the course of their trade or business. This court upheld the constitutionality of section 26286.5 upon a related attack in *People* v. *Galway,* 120 Cal. App.2d 45, 49 [260 P.2d 212]. Taken with the sections defining advertising (Health & Saf. Code, § 26209), drug (Health & Saf. Code, § 26200) and device (Health & Saf. Code, § 26202), and with Health and Safety Code, section 26273, which removes the prohibition when the value of a drug is established in a manner provided by law, section 26286.5 states clearly what is prohibited: It prohibits advertisement likely to induce sale or purchase. It does not prohibit free interchange of ideas respecting the listed diseases.

9) *The trial court improperly rejected a plea of once in jeopardy.*

▪ The instant trial followed this court's reversal of judgments of conviction entered in an earlier trial. At the first trial, after the jury began deliberating, the trial court dismissed a juror, replacing her with an alternate. Defendants contend the first trial court improperly secured the juror's dismissal; the improper dismissal constituted a discharge of

the jury and, therefore, an acquittal; the instant trial court erred in refusing to admit evidence of the improper dismissal.

The dismissal of the juror and her replacement by an alternate did not constitute a discharge of the jury. There was, therefore, no double jeopardy (Pen. Code, § 1089; *People* v. *Hess*, 104 Cal.App.2d 642, 680 [234 P.2d 65]; *People* v. *Burns*, 84 Cal.App.2d 18 [189 P.2d 868]). Any error in the manner in which the trial court dismissed the juror was cured by our reversal, for other reasons, of the judgment entered after that trial (*People* v. *Burns, supra*, 84 Cal.App.2d 18). The instant trial court properly rejected the plea of once in jeopardy without admitting the offered evidence.

10) *The prosecutor's comments violated Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 196, 85 S.Ct. 1229].

 In their opening brief, defendants neither recite the allegedly improper statements nor indicate where in the 3,804-page reporter's transcript the alleged error appears, as required by rule 15(a), California Rules of Court.

During *voir dire* examination of the jury, over forty days before the jury began deliberating, defense counsel asked a prospective juror:

". . . at the termination of the prosecution's case it then becomes incumbent upon the defense to decide what to do, and it may be, at least speaking as counsel for Mr. Smith, that I feel the case is insufficient. I don't think there has been a crime committed. We might even go to the extent of resting at that time and putting the prosecution as standing on their own evidence. Would you feel that if we ceased activity at that point and said, 'We feel the case is insufficient', and the Judge turns the case over to you, even at that juncture, would you still feel that the People have to prove their case beyond a reasonable doubt?"

Later, examining another prospective juror, defense counsel asked:

". . . the People will put on their case first, and it may be after listening to all the evidence that we . . . may feel the People have no case. We might say, 'Rest.' Would the fact that we do this and have you judge the case solely upon the prosecution's evidence—this wouldn't lead you to believe they must be guilty unless they prove their case; isn't that right?"

The prosecutor, then, questioning a prospective juror, said: "And now in reference to another question by Mr. McKis-

sack about the defendants not taking the stand because their counsel thinks that the People haven't proven their case, I don't know—certainly I know even less than Mr. McKissack might know whether the defendants will or will not take the witness stand, but if they do not take the witness stand, will you recall that there are reasons other than the fact their attorneys don't think the People have proven their case—''

At this point, defense counsel objected. Defendants did not testify.

Defendants' contention must fail for several reasons. Defense counsel's remarks invited the prosecutor's response. The prosecutor met the suggestion defendants might not testify if the People's case is insufficient by responding there might be other reasons for not testifying. The prosecutor did not suggest these other reasons. Unlike *People* v. *Stout,* 66 Cal.2d 184, 198-200 [57 Cal.Rptr. 152, 424 P.2d 704], the prosecutor did not go beyond response and suggest the jury infer guilt from failure to testify. The trial court ordered the prosecutor's comment stricken and admonished the prospective jurors to disregard it. Later the defendants accepted the jury.

11) *The trial court erred in admitting tape recordings of lectures given after defendants' arrests.*

 Defendants contend the tapes are inadmissible because after arrest, but before giving these lectures, they were not warned of their constitutional rights, citing *Massiah* v. *United States,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].

The tapes are admissible. Neither *Massiah* v. *United States, supra,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], nor, for that matter, *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], is applicable here. Defendants were neither in custody at the lectures nor subject to a process of interrogation lending itself to eliciting incriminating statements. Defendants' brief, furthermore, does not indicate they objected upon this ground in the trial court. (See *People* v. *Hillery,* 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382].)

12) *The trial court erred in allowing the tape recordings to be played without deleting Hohensee's references to Smith.*

 Defendants complain of Hohensee's references to Smith's pamphlet distributing and money collecting activity, citing *People* v. *Aranda,* 63 Cal.2d 518, 530 [47 Cal.Rptr. 353,

407 P.2d 265]. Hohensee cannot complain. As to Smith, Hohensee's statements merely corroborate witnesses' testimony describing Smith's activity. The tape recordings included, furthermore, Smith's self implicating lecture on, among other things, the alleged miracle food, wild rice. There was no prejudicial error. (Cal. Const., art. VI, § 13; *People v. Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *People v. Charles,* 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545].)

13) *A conviction unsupported by evidence is a denial of due process.*

In answer to this contention it is enough to restate the evidence amply supports the judgments of conviction.

Judgments affirmed.

Coughlin, J., and Whelan, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 12, 1967.